IN RE ESTATE OF SADIE F. CLARK.

MARY CLARK DESPECHER et al., Petitioners, Appellants; STATE OF IOWA et al., Petitioners, Appellees, v. DANIEL T. SULLIVAN, Administrator, Appellee.

No. 44306.

No. 44419.

No. 44589.

FEBRUARY 6, 1940.

REHEARING DENIED JUNE 20, 1940.

Daniel T. Sullivan, for himself as administrator, appellee.

78

James C. Kinsler and George H. Mayne, for Despecher et al., appellants.

H. J. Hull and Harry B. Swan, for Garber et al., appellants.

John H. Mitchell, Attorney General, Leon W. Powers, Paul E. Roadifer, and Addison G. Kistle, for State of Iowa and C. B. Murtagh, Comptroller, appellees.

BLISS, J.—Sadie F. Clark died intestate, at the age of about 70 years, on July 31, 1935, leaving an estate, valued by the collateral inheritance appraisers as follows: Real estate, both city and farm property, at $102,250; cash on hand, $17,803.55; federal, county, road, and private bonds, at $135,505.01; real-estate mortgages, at $14,790.25; jewelry, at $377.50, and household furniture and wearing apparel, at $350. She had received all of this property as the sole beneficiary under the last will and testament of her husband, Albert A. Clark, who had died on July 21, 1921, at the age of 61 years. Starting life as an abandoned illegitimate child, Clark acquired this property by his personal efforts. Mrs. Clark suffered a nerve stroke of some kind in February 1908 which impaired her mind to some extent. While her condition required the care of practical nurses thereafter, she at all times conversed with and recognized those about her, and she was not placed under guardianship until March 20, 1926. Her disability continued until her death. She never married after the death of her husband, and so far as known, or could be ascertained, she left no heirs of her blood, either ascending, descending, or collateral. She came to Omaha in the late eighties, and for a year or more was an inmate of a house of prostitution.

Albert A. Clark, not yet 30 years old, was in the small loan business in Council Bluffs. He was the owner of a business building at a corner of Main and Broadway, on the second floor of which was his office and place of business, and on the third floor was his living apartment. About 1889, Sadie Clark, then known as Sadie Moore, was in his office, as clerk or secretary, and in his apartment, as housekeeper. This arrangement con-

tinued until the early nineties when he stated that they were married, and he introduced her and presented her generally as his wife. They lived in the apartment, as husband and wife, continuously until several years after 1900. During all of this time she continued to help him in the office. They then moved into the old home at 507 Clark avenue, which his mother and her second husband, Dr. F. C. Clark, had acquired in 1866, where they continued to live, as husband and wife, until his death. Except for some talk early in their relationship, no one ever questioned their marital status. They were generally reputed to be married. They were so known to the businessmen, tradesmen, professional men, and to the public generally. Services were rendered and merchandise was sold and charged to them as Mr. and Mrs. Clark. Commencing on the 10th day of November 1897, and continuing to 1918, they executed and acknowledged 18 conveyances of real estate, as husband and wife. All of these were received by the grantees and placed of record. The public city directories of Council Bluffs listed them as husband and wife, and, after his death, she was listed as his widow. On August 24, 1899, he executed his last will, which he never thereafter changed, in which he stated:

"I will, devise and bequeath unto *my wife Sadie F. Clark,* all of my estate of which I may die seized * * * I hereby appoint *my wife Sadie F. Clark* the sole executrix of this my last will and testament, and direct that she be not required to give any bonds as such."

This will was probated, and four days after the testator's death, on July 25, 1921, Sadie F. Clark executed a petition for the appointment of John M. Galvin, as administrator with the will annexed, in which she states:

"Your petitioner *respectfully represents*: That *she is the widow* and sole devisee and beneficiary under the last will and testament *of Albert A. Clark.*"

She signed and swore to this paper before Daniel T. Sulli-

van, the present administrator of her estate, who designates himself as "appellee," herein.

On July 3, 1939, an order of court, by Judge O. D. Wheeler, was filed in the estate of Albert A. Clark, approving the final report therein, which states:

"The Court especially finds *that said Albert A. Clark left surviving him as* his sole beneficiary and devisee, *his wife, Sadie F. Clark;* * * * "

This adjudication of their marital status stands unquestioned of record. Witnesses unrelated to any of the petitioning heirs and uninterested and of good repute, so far as the record shows, testified to the general reputation in the community, that they were man and wife. No witness and no item of evidence contradicts this record. In fact, the appellees State of Iowa and its Comptroller put in no testimony or evidence, and the appellee administrator put but one witness on the stand, and that was on another issue.

After her husband's death, Mr. Galvin, the administrator of his estate, and Daniel T. Sullivan, of his law firm, in charge of Mrs. Clark's property, sought to learn from her something of her past and her people, but received no information in any way helpful. The appellants Despecher et al., through an attorney, during those years, sent out pictures of Mrs. Clark to learn something of her. Some publicity was given to the matter and some further search was made for her blood relatives, by those in charge of her property, before her death. Relatives of her husband claimed that she always maintained that she had been left as a foundling on the doorstep of an orphanage, and that she had no knowledge of her origin or of her people. About 1929 a man named Edward Howard Smith, from Pittsburgh, Pennsylvania, called upon her and claimed that he recognized her as a long lost sister, and that another sister by the name of Anna Call, lived at Unity, Ohio. Mrs. Clark in no way recognized Smith. After his appointment as administrator, Mr. Sullivan, in his search for blood heirs of the decedent, wrote by registered mail to Anna Call and her brother, and on November

11, 1935, she answered with a letter which very definitely elimi-
nated them as claimants, since it stated that the Sadie Clark,
who was her sister, was born in July *1879*. Other evidence in
the record clearly shows that there was no basis for the claim
of herself or her brother. Neither of them ever pressed their
claim further.

Before proceeding further in this complicated matter we
believe it will be clarifying to set out, as briefly as possible,
something of the lineage of Albert A. Clark, through whom all
of the appellants claim title to this estate, as the record tends
to disclose it. Speaking first of his mother, of whom all parties
concede he was the illegitimate son, it appears that Mary Eliza-
beth Page, the daughter of Daniel Augustus Page, a Baptist
minister, was born February 29, 1836, at Napierville, Illinois,
and in 1850 married Robert Emmett Babbitt. To this union
two children were born, both at Napierville—one Louisa Marie,
on April 23, 1855, and William Newton, on September 7, 1856.
In the late fifties the family came to the town of Lewis in west-
ern Cass county, Iowa. Whether the father came with them
or had gone farther west earlier does not appear, but word came
back to the family in 1858 that he had died from gangrenous
poisoning in New Mexico. The mother of Mrs. Babbitt, and
two sisters of the latter, Adelia and Sobrina Page Shields, and
one or two brothers had also come to Cass county with the
family. Two witnesses, each 84 years old at the time of the
hearing in September 1936, Alice Morphy of Kansas City and
Mary Jane Worth of Lewis, remembered of Mrs. Babbitt and her
family being in Lewis, as early as the spring of 1858, and for
some years later. Mrs. John R. Black of San Antonio, Texas,
who came to the locality about 1855, saw Mrs. Babbitt during
these years. Two brothers, Joseph and Leonard Everly, and
their families also lived in that locality. Leonard was born in
1830 and came to Ludley's Grove, in Cass county in 1855. He
was a successful horse trader. Joseph Everly operated the hotel
at Lewis, according to the testimony of Daniel Winchester Wood-
ward, a 91-year-old witness, who recalled seeing two of the Page
girls about the hotel. Joseph Everly married Adelia Page for

his second wife. All parties concede that Mary Elizabeth Page Babbitt gave birth to an illegitimate son on December 9, 1860, whom she named Albert Augustus. His half sister Louisa, who was then almost 6 years old, remembered being sent by her mother for Grandma Hopley to aid in the confinement. This fact was proved by evidence of her declarations under the pedigree exception to the hearsay rule. Mrs. Morphy testified that Mrs. Babbitt from 1858 to 1862 lived within less than a mile of her home; that she had visited at the Morphy home in 1858 and that she also visited in the neighborhood at the home of her sister Mrs. Shields, and that in 1861 she saw Mrs. Babbitt with a child in her arms, "who was quite small, just a baby, when I first saw it"; that Mrs. Babbitt nursed the child and acknowledged that he was hers, and called him Albert. She also testified that it was general neighborhood knowledge that Leonard Everly had visited with Mrs. Babbitt and had been in her company prior to the birth of the child, and also that it was the general repute in the neighborhood that Leonard Everly was the father of the child. She testified that Mrs. Babbitt left that vicinity after 1862. Other testimony relative to the Leonard Everly relationship will be referred to later. Leonard Everly died intestate in 1871. The petitioning heirs referred to in the title as Vera Everly Garber et al., are granddaughters and grandsons of Leonard Everly, and they claim title to one half of the property in controversy as the only heirs of Albert A. Clark, on his father's side. We will refer to them hereinafter as the Everly claimants.

After Mrs. Babbit left Lewis she came to Council Bluffs and later found work with a wagon train which was going West in 1863. She was burdened with her three children, and left them with her mother, and went on with the train. She left the train at Boise City, Idaho, and found work there, and on June 11, 1864, married Dr. F. C. Clark, a dentist at that place. In 1866, Dr. Clark and his wife returned to Council Bluffs, where he bought a home that year and began the practice of his profession. Dr. Clark took his wife's three children into their home and the illegitimate son was thereafter always known as Albert

A. Clark. Six children were born as the issue of the marriage of Mary Page Babbitt and Dr. Clark. Three of them died unmarried and without issue. Three of the children are living and are claimants in these proceedings. They are Mary Frances Despecher, born April 15, 1869, Martha Ann Wedge, born August 28, 1872, and Mittie Jane Sauer, born August 22, 1879. Their mother, Mary Page Babbitt Clark, died December 31, 1916, and their father died December 17, 1917.

Louisa Marie Babbitt, the first child of Mary Page Babbitt and Robert Emmett Babbitt, married Daniel I. Morse, February 26, 1871, and the only child of this union was George F. Morse, born August 19, 1872. The mother died April 20, 1912, and the father died March 1, 1923. The son, George F. Morse, was a witness at two of the hearings in these proceedings, but died in December 1936, leaving the petitioning claimants, Malinda Morse, his widow, and Dessa L. Morse et al., his four children, who were substituted as claimants in his stead.

William N. Babbitt, the second child of Mary Page Babbitt and Robert Emmett Babbitt, was married in 1879 and died in 1919. His widow, Anna Babbitt, survives, and also six children, Lydia A. Hollingsworth et al., who are petitioning heirs herein. All of the petitioning heirs listed in the title as Mary Clark Despecher et al., excepting Malinda Morse, widow of George F. Morse, are children, grandchildren, or great grandchildren of Mary Page Babbitt Clark, and are the only heirs of Albert A. Clark, on his mother's side. For brevity and identity this group of appellants will hereinafter be referred to as the Clark claimants. There is no dispute as to the lineage of the Clark claimants, nor to their relationship to Albert A. Clark. There is also no dispute as to the lineage of the Everly claimants, and their relationship to Leonard Everly; but the Clark claimants and the appellees deny that Leonard Everly was the father of Albert A. Clark, or that there was ever such recognition of that fact between them as is contemplated by section 12031 of the Code. The appellees further contend that even though the lineage of the two sets of claimants and the alleged parentage of Albert A. Clark be conceded, neither set is entitled to any part of the

estate of Sadie F. Clark, for three alleged reasons: First, because it is necessary that they show, and they have failed to show, the nonexistence of all heirs of Sadie F. Clark, through her own blood line; second, because it is necessary that they show, under section 12026 of the Code, and they have failed to show, that Albert A. Clark was the husband and spouse of Sadie F. Clark at his death; and third, that even conceding the establishment of the facts in the two contentions just stated, neither set of claimants is entitled to recover because, since Albert A. Clark was a bastard, the stream of heritable blood stops with his father and mother and does not flow through and beyond them into their respective heirs, so as to constitute them heirs of Albert A. Clark, and thus heirs of Sadie F. Clark. The first two contentions are factual, and the third is one of law.

It seems necessary to us at this time to discuss the nature of the proceedings, and the procedure employed. And we say advisedly that there was little of consistency or regularity in the procedure employed in the progress of the proceedings. This has added to the labor of reading a printed record of over 1,700 pages, and 3 transcripts of testimony, several typewritten motions, resistances thereto, briefs and argument in support thereof, the bulky files in the estate, all consisting of hundreds of other pages, which were certified to us, and which we had to read, and to re-read many parts, to settle fact disputes of counsel, and statements of court and counsel which were contrary to our memory of the record as we first read it. We say this not in criticism of the trial court because to have carried accurately in his memory the testimony given at five separate hearings over many days, from December 1935 to July 1937, is not to be expected. Expressions of court and counsel throughout the hearings indicate much doubt in their minds as to whether the matters were triable in equity or at law, and whether they were being tried in equity or at law. The administrator, on the application of some of the Clark claimants, had received his appointment on August 1, 1935. On September 10, 1935, the Clark claimants filed their petition, in probate, paragraphed and numbered as in an equitable proceeding, alleging that no heirs

of the blood of the decedent could be found, and that as the sole and only heirs of Albert A. Clark, the only spouse of Sadie F. Clark, they were entitled under section 12026 of the Code, to her entire estate, and they prayed for an order and decree establishing their heirship as alleged, and that the administrator be required to answer showing all facts within his knowledge relative to the heirs of the decedent, and that a hearing be had on the pleadings. On order of the court, the administrator filed his answer, paragraphed and numbered, alleging that the decedent "was the widow of Albert A. Clark," and that he and Galvin, the administrator of the Albert A. Clark estate and guardian of the decedent, on various occasions had endeavored unsuccessfully to obtain information from her as to her family and relatives, and that he was therefore unable to file a list of heirs, until they could be judicially determined. He prayed that a hearing be had and a notice ordered therefor, and that all claimants be required to produce strict proof of their alleged claims.

A notice directed "to all persons interested in or claiming an interest in the estate of Sadie F. Clark, and all persons claiming to be heirs at law or heirs by blood of said Sadie F. Clark, and to all persons claiming to be heirs at law or heirs by blood of Albert A. Clark" was published by the administrator in four issues of the "Council Bluffs Daily Nonpareil", of the hearing and of the claims of the petitioners.

Harriet Page Brackett and seven others, claiming to be heirs of Albert A. Clark, through Thomas Page an alleged brother of Albert's mother, filed application for an order protecting their interests as heirs. Maggie Avery and six others made claims as heirs through the Page branch. Bernice Everly Thomas and Belle Everly Brown made claims of heirship through the Everly branch. On December 18, 1935, the administrator filed his inventory of the estate, restating his inability to list the heirs, referring to Albert A. Clark, as "the husband of Sadie F. Clark." The administrator filed a second amendment to his answer for an order appointing himself or someone else to make further investigation to discover possible heirs of Sadie

F. Clark. Hearing was had upon the various applications commencing on December 23, 1935. Each group of claimants was represented by separate attorneys, and the administrator, resisting all claimants, appeared pro se. Edward Howard Smith and his sister Anna Call, and Albert E. Clark and his sister, Etha Beebee, though served with notice, did not appear and were adjudged in default. On December 28, 1935, the court made and entered of record an order, which after reciting the appearances and said defaults, stated:

"And said cause having been fully submitted on all issues joined under the pleadings and claims as filed herein, and upon the default as hereinbefore entered, and the court having seen and heard the evidence and being fully advised in the premises, finds: First: That Albert A. Clark * * * was, until the time of his death, the spouse of this decedent Sadie F. Clark * * *. Second: That said Albert A. Clark, deceased, was a son of Mary E. Clark, * * * and that had said Mary E. Clark outlived said Albert A. Clark, she would have been the sole heir at law of said Albert A. Clark under the provisions of Section 12030 of the Code of Iowa of 1931, and that these petitioners, Mary Clark Despecher, Mittie J. Sauer, Martha A. Wedge, George F. Morse, Lydia A. Hollingsworth, Arthur Babbitt, Albert F. Babbitt, Mabel Woodward, Maud Schultz, and Margaret Barrett are the children and grandchildren and sole heirs at law of said Mary E. Clark, deceased, and as such are the sole heirs at law of said Albert A. Clark, with the respective interests as such heirs as follows: * * * [stating the interests]. Third: That Edward Howard Smith and Anna Call, who, prior to the death of said decedent Sadie F. Clark, had claimed to be a brother and sister of said decedent, are not so related to decedent and are not in any manner heirs by blood or heirs at law of said decedent, * * * and that up to the date of this judgment and order no heirs of said decedent Sadie F. Clark have been found, and that this administrator * * * has up to the date of this order, been unable to obtain any information as to the family or relations of said decedent, and that no persons other than the above named Edward Howard Smith and

Anna Call have appeared or made claim to be related by blood to or heirs at law of this decedent Sadie F. Clark. Fourth: That there may be unknown heirs of the said Sadie F. Clark, deceased, and that if such heirs exist and can be found, their relative shares and claims cannot at this time be determined, and for the purpose of being fully advised in the premises before a final decree of heirship is entered herein, the Court hereby appoints Daniel T. Sullivan, administrator * * * as referee to investigate, ascertain and discover whether or not any heirs of the said decedent Sadie F. Clark can be found, and to fully report his findings to this Court * * * on the 17th day of March, 1936, and for the purpose of allowing and fixing a definite date for the making of said investigation and for the making and receiving of such report of said referee, and for no other purpose, this hearing for the purpose of determining whether heirs of said Sadie F. Clark, deceased, can be found is hereby continued to March 17, 1936. It is therefore ordered, adjudged and decreed that the petitions, applications and claims of Harriet Page Brackett, et al, Maggie Haines Avery, et al, Bernice Everly Thomas and Belle Everly Brown [fifteen in all] be and are hereby dismissed, denied and held for naught, and that judgment be and is hereby entered against the above named parties in favor of Daniel T. Sullivan as administrator for costs * * *.

"It is further ordered, adjudged and decreed that Albert E. Clark, Etha Beebee, Edward Howard Smith and Anna Call, having been duly notified of the pendency of this hearing and in default as hereinbefore found, are hereby forever barred and estopped from having or claiming any interest in the estate of said decedent Sadie F. Clark * * *.''

The hearing preceding the entry of the foregoing order, judgment and decree was conducted as an equitable proceeding, and there was no ruling upon objections to any of the questions or answers. The baptismal record of the Sadie F. Smith who was the alleged sister of Edward Howard Smith, showed that she was born in the latter part of 1881. Just before the conclusion of the hearing the following colloquy took

place between the court and Mr. Tamisiea who appeared for Harriet Page Brackett et al.

"The Court: Are you going to introduce any testimony, Mr. Tamisiea?

"Mr. Tamisiea: If your Honor please, I understand these claimants have not rested yet, the people who I represent, Mrs. Rief, claiming to be a first cousin of Albert A. Clark. Now without anticipating any order that the Court might enter here, if the Court is satisfied that Mrs. Despecher and others are in fact half sisters, as I understand the law of descent, even though she could show she was a first cousin, she would be too remote, and Mrs. Despecher and her sisters would, under the statute take ahead of any claim that Mrs. Rief and her sisters and brothers would have. We didn't know just what these claimants could prove, and I don't want to take up the Court's time, if the Court is satisfied regarding these people have proved the relationship, if they have, I think it would be idle to go ahead and prove Mrs. Rief as a first cousin.

"The Court: There is no doubt in the mind of the Court but what they have proved that they are direct relatives of Al. Clark in capacity of half, then those whose relationship is so remote as first cousins are not subject to inheritance. I don't believe there is any question but what the evidence shows that that part has been established. The Clark girls and Babbitts have established their relationship in the half cast. That, under the law of the State of Iowa would bar those as remotely removed as first cousins.

"Mr. Tamisiea: The only possible claim Mrs. Rief could raise would be in the event of failure of proof. I think they can establish that they are first cousins and I don't think that would be material here.

"The Court: I think under the law of the State it would make no difference if these other folks have established half cast relationship. And in my judgment they have established that."

None of the claimants against whom judgment was taken in the decree of December 28, 1935, ever appealed therefrom.

On April 4, 1936, the Everly claimants, Garber et al., filed application of their claim to one half of the estate as heirs, through Leonard Everly, the putative father of Albert A. Clark, and asked that the decree of December 28, 1935, be reopened and modified to permit a hearing on their application. This was granted. Both the Clark claimants and the Administrator unsuccessfully attacked this application, in various ways.

On June 27, 1936, the appellees State of Iowa and its Comptroller first appeared in the estate proceedings. Notwithstanding there had been no notice given to the Comptroller by a judge of the 15th judicial district, or by the clerk of the district court of Pottawattamie county, that the property of the estate was uninherited, as provided in code section 12036, and notwithstanding there had been no report to the court by the referee appointed to investigate and find who were the heirs of the decedent, and notwithstanding the court had found that Albert A. Clark was the spouse of Sadie F. Clark, and that the Clark claimants were the heirs of Albert A. Clark, through his mother, these appellees filed an application for an order escheating all of the estate to the appellees, as provided by Code section 12036 et seq. The appellees also filed another application for an order vacating the order and decree of the court of December 28, 1935, insofar as it in any way affected the rights of the appellees to escheat the property. On the same day, at an ex parte hearing without any notice to any of the parties affected by the decree of December 28th, or to any of the claimants or their attorneys of record, and notwithstanding the decree was 6 months old, and two terms of court had passed since its entry, the court, upon the application of the appellees' attorneys, Powers, Kistle, and Roadifer, whom it found to have been "duly employed by the Executive Council of the State of Iowa," granted said orders.

The only possible way in which the decree of December 28, 1935, could adversely affect any escheat rights of the State was the finding of the court that Albert A. Clark was the spouse of Sadie F. Clark, and that the Clark claimants were the heirs of Albert A. Clark. On the same day the orders were granted

the appellees in their answer to the petition of the Clark claimants admitted Albert was the spouse of Sadie. On September 14, 1936, they amended their answer and withdrew this admission. On this last date the hearing upon the application of the Everly claimants was begun and it continued for several days. The State, the Administrator and the Clark claimants all strenuously objected to every item of proof offered. In the hearing preceding the decree of December 28th the Clark claimants had introduced evidence supporting fact issues whose proof was essential to the establishment of the claims of both sets of claimants. Counsel for the Everly claimants insisted that the cause was of an equitable nature, and that they should be permitted to proceed by equitable proceedings in the introduction of their testimony. All other participants objected. The Everly attorneys protested that they did not wish the record to show their consent to trial as an ordinary action, and contended that it was triable by reason of the conduct of the attorneys in the preceding hearing wholly as an equitable action. The court stated that the pleadings were as in an equity action. Those opposed prevailed and the trial proceeded as one at law. The Everly claimants then offered the transcript of the testimony taken at the December hearing, and this was refused. They were then compelled to use hostile Clark claimants as witnesses, with disappointing results. The testimony of their own witnesses, who were all very old people, was practically all stricken, and much of it erroneously, and for a day or so they made a record by offers of proof. Further colloquy was then had as to whether any of the testimony introduced at the previous hearing of the Clark claimants could be considered in passing upon the Everly claims. The State et al. contended that it could not be, counsel for the State saying:

"We had no opportunity to object to any of the evidence that has been heretofore submitted, *that was tried as a proceeding in equity and we had* no opportunity to cross examine."

The court in answer protested that it was not fair for the State to come in at "this time" and insist upon a re-examina-

tion of matters covered in the previous hearing. Counsel for the Everly claimants stated:

"Our understanding has been that this first evidence has been taken, that this was a continuance of that hearing, and we assumed that the same rules would apply to our evidence as was to the other evidence, to be tried in the same manner. Now we find we are trying a lawsuit without any evidence in it apparently."

They then suggested that since their witnesses were old and might not long be available, and that since there would likely be an appeal from the judgment, and that it was important that all the testimony be preserved and presented to the appellate court to be passed on rather than be sent back for retrial because of errors, that after objection to a question was made, the witness might answer, subject to a motion to strike. This procedure was thereafter followed with respect to the testimony of the Everly claimants. Much of the testimony stricken was admissible. At the close of their testimony the Everly claimants moved the court to reconsider its rulings in striking out the answers of their witnesses on the objections of the State, the Administrator and the Clark claimants. The motion was overruled. At this time it was suggested that a definite time should be fixed for the Administrator, as referee, to report the result of his investigation to ascertain whether heirs of Sadie F. Clark could not be found. The Administrator requested 60 days more, stating:

"When my report is finally received I believe I have exhausted every avenue that I can."

One of the counsel for the State stated that the investigation was neither admissible, competent nor material on any question. Another of the State's counsel stated:

"I am honest with you now in my legal opinion. I don't know. I told everybody present here that I don't think anybody knows what we are trying now. Now that is my opinion about it, right or wrong or otherwise. There is not any pro-

ceeding known to the Iowa law for determination of heirship. Mr. Kinsler has that over in Nebraska by statute now, but there is not any in Iowa. There never has been. And I say I don't know. And I don't think anybody knows really what we are trying, or how, whether equity or law. And I say that advisedly. It may be a shock for somebody when things occur somewhere along the line, that we have not been trying anything. * * * That is the reason why we have stated at all times the probability there was no foundation laid for this proceeding. * * * Why I am surely like Mr. Kinsler has announced himself from time to time, whether it was intentionally or otherwise, I don't know where we are at.''

''Mr. Kinsler: I think I do know where we are at.

''Court: Don't any of us know exactly where we are at, but we are on the road. I think we are on the road to a proper settlement of this entanglement.''

The hearing was continued to October 5, 1936, when the Clark claimants introduced testimony of 15 witnesses tending to show that Albert and Sadie Clark were husband and wife and so lived and were so regarded for 25 years before the death of Albert. At this time the dispute again arose as to whether the evidence introduced by one set of claimants could be considered as a part of the record in support of the claims of the other set. This colloquy then took place:

''Court: Everything that is in this case is for the benefit of anybody in connection with the case. I can see no use in going over that stuff that is already in the record because other parties who come in after that, they come in taking what they can get.

''Mr. Mayne: I just wanted to be sure about that for the purpose of avoiding any doubt about the record.

''Mr. Swan: Just to get that clear, do I understand then that the entire testimony offered at the December hearing is in. I was under the impression that all of the testimony was stricken, and I would have to go to the trouble to prove. Then that testimony which when I started to offer it the other day,

someone objected to it and kept it out. Is that a part of this record?

"Court: Yes, a part of the record."

The objection of the State was overruled. The court further stated: "This hearing, like all hearings heretofore, is largely for the purpose of enabling the administrator to make a report as to who, in his judgment, are the heirs."

On November 16, 1936, Kathleen Smith Shultz of Xenia, Ohio, filed a claim of heirship stating that she was a daughter of Sadie F. Clark, and her sole and only heir. Later she amended to state that she was an illegitimate daughter.

On the same day Amanda Hoover of Pennsylvania filed a claim that she was the only sister and heir of Sadie F. Clark. Later she amended her claim and included 17 other alleged heirs in addition to herself.

On March 2, 1937, the court entered an order of escheat because they were in default for not filing claims as provided in the original order of escheat against all claimants excepting the Clark claimants, Everly claimants, Amanda Hoover et al., and Kathleen Smith Shultz.

On May 18, 1937, Amanda Hoover et al. filed a withdrawal of their claim to any part of the estate, stating therein that it was without prejudice to their right to assert it in any proceeding in the future. Kathleen Smith Shultz made a like withdrawal. The court made an order exonerating the cost bonds on each claim.

On June 28, 1937, 18 months after his appointment as referee to search for heirs of Sadie F. Clark, the Administrator filed the report of his investigation, and after recounting in detail the tracing down of every clue or bit of information that came to his knowledge, he therein stated:

"Administrator further reports that in addition to the above information set forth he has also contacted other persons and inquired in various places in an effort to locate some one who might be able to disclose information about the immediate family of the said Sadie F. Clark, or any blood relatives which

she may have had, but has been unable to learn from any one, or in any place, about any person who, at this time, could definitely identify himself or heirs as a blood relative or next of kin of the said Sadie F. Clark. * * * Your administrator further reports that he has been unable to learn from any persons who may have known Albert A. Clark; that Albert A. Clark never disclosed, if he knew, anything about the family or blood relatives, heirs, or next of kin of the said Sadie F. Clark. * * * That your administrator has been unable thus far to find and is unable, at this time, to list an heir, or heirs of Sadie F. Clark which could be classified under Sections 12016, 12017, 12024, 12025, 12027, 12028, Code of 1935, said Sections of said Code being those which name and classify the heirs either direct or collateral of an intestate; or Sections 12030 and 12031. * * * Administrator further states that, at this time, there is no claim filed or pending in this estate wherein any claimant alleges that such claimant is a blood relative or a direct or collateral heir in the blood of Sadie F. Clark.''

As noted above, the Administrator states he found no one who could "*definitely identify* himself or heirs as a blood relative, etc.'' His report, his cross-examination thereon, the files in the estate, and the entire record disclose no one who in the slightest manner so identifies himself or anyone else as such an heir.

A hearing was had just following the filing of the report, at which the Administrator was cross-examined on his investigation as reported. He testified:

"I have been the administrator since about the 1st day of August, 1935. I have tried to be diligent in finding such heirs of Sadie Clark as may exist, being blood heirs. I have to the best of my ability traced down, *or caused to be traced down,* all clues that I have, and to this date, as the result of that, I have not been able to find any one who I would say is the blood heir of Sadie F. Clark.'' (Italics ours.)

He made personal investigation of the Shultz claim, in-

cluding the hospital records of her birth, and satisfied himself that she was not the daughter of Sadie F. Clark.

At this hearing some discussion arose as to the status of the referee's report:

"Mr. Roadifer: I think we ought to have it settled in this record in some way as to the status of this report. I don't know. This is an unusual proceeding. There is nothing in Iowa except the Bradley case that indicates the true procedure. But the order was made for a referee to make this investigation. He has made his investigation and filed his report. That is a filing in the probate of this estate. Everyone is here and apparently have been treating it as some part of the record. * * *

"Court: It strikes me when it is filed it is a part of the record in this case. As the record stands he was ordered to gather the data and he makes and files this report. * * *

"Mr. Kistle: Of course, your Honor, the Court only had the administrator to make as searching investigation to see if any heirs of Sadie Clark by blood could be found. As I understand it, the Administrator has been at work on this about a year—two years, and he has searched and gone to Pittsburgh and to Cincinnati, I understand it, at least various places—to Chicago, he has searched and searched and searched, he comes in and tells the Court, 'Well, Judge, I have hunted everywhere that I could think of, any place that I have heard there is possibly anybody claiming to be an heir, and I can't find any heirs.' Well, your Honor, you say, 'We will put it in writing then, so it will be here as part of the records, then everybody in the world will know that I have had this report from you, and it will be here in the files so they will be able to see why I did what I do.' That is my thought of it. You have got a report now in writing from the administrator, and he tells you he can't find any heirs of Sadie Clark anywhere. * * *

"Mr. Roadifer: The thing I was concerned with was whether or not this report had been offered in evidence at this hearing.

"Mr. Powers: As a part of the cross examination of the

witness Sullivan the State offers the report made by him and filed in this case today in evidence.

"Mr. Mayne: If your Honor please, I am not objecting to the report, because it is filed and under the orders under which it was made it is now inherently and necessarily a part of the record in connection with this investigation that the court is directing on his own motion. We desire, however, to object to the report in so far as it tends to be proof of any matters offered therein. I mean any matters touched upon which are clearly hearsay, incompetent, immaterial and irrelevant. * * *

"Mr. Swan: I also want to renew the motion that I made as it appears on page 521 of the transcript, * * * and add to it the further ground that this matter may be triable in equity and has been tried under equity rules, and that all of the evidence should be considered by the court if upon final submission he should determine that said evidence was competent and material to the matters involved.

"Mr. Kistle: If the court please, I don't know. Maybe nobody knows whether we are trying this case in law or in equity, but the original rulings were upon the theory we were trying it in law.

"Court: Yes, *that was to start out.* [Italics ours.] * * *

"Mr. Roadifer: I don't understand any ruling was made on that report.

"Court: I will have to take that report into consideration in order for me to make my mind up.

"Mr. Kistle: My understanding is that the Court makes the ruling that that report is filed and is a part of the record in the case, *that is all.*

"Court: Well, now, *that is all.*" (Italics supplied.)

All parties then rested, and the cause was fully submitted on July 2, 1937.

On August 14, 1937, the Administrator, as referee, filed a supplement to his report, in which he stated:

"That since the filing of his aforesaid report, your administrator. has caused an examination of the records of the

twelfth census of the United States to be made insofar as the same pertains to Sadie F. Clark, decedent herein. That said examination * * * discloses that on the 8th day of June, 1900 in the city of Council Bluffs, Kane Township, Pottawattamie County, Iowa, one Robert Green, enumerator, enumerated and made a record for the purpose of said twelfth census, *that Sadie F. Clark was the wife of Albert A. Clark*; that Sadie F. Clark was born in the month of April, 1866; that on the 8th day of June, 1900, Sadie F. Clark was past thirty four years of age; *that on the 8th day of June, 1900 she was married* and had been married at that time for six years; *that she was the mother of no children; that she then had no child living.* * * * that her residence was 421 Broadway, Council Bluffs, Iowa." (Italics supplied.)

The report also showed she was born in Pennsylvania of parents born in Germany.

On August 20, 1937, the court entered judgment. Before referring to the findings and decision of the court, we call attention to the following statement therein:

"At the outset the court wants to dwell briefly on the testimony offered by the claimants represented by Harry B. Swan and H. J. Hull. [Everly claimants.] At the time the evidence of the witnesses was presented for the claimants represented by these gentlemen there was some question in the mind of the court as to the admissibility of a large part of the testimony offered, and the evidence was permitted to be taken with the understanding that the court could consider the same at a later day and decide on its admissibility."

The record discloses no such agreement. Substantially all of this testimony was stricken, and much of it was admissible.

After discussing the reason for the admissibility of declarations and reputation respecting matters of family history, pedigree, etc., of the admissibility of which there can be no question, (Alston v. Alston, 114 Iowa 29, 86 N. W. 55; In re Estate of Frey, 207 Iowa 1229, 224 N. W. 597; In re Estate of Carroll,

149 Iowa 617, 128 N. W. 929; McKeown v. Brown, 167 Iowa 489, 149 N. W. 593, 3 Wigmore on Evidence 2d Ed., section 1487; Smith v. Fuller, 138 Iowa 91, 115 N. W. 912, 16 L. R. A., N. S., 98), the court further states in its judgment:

"The rule of law being that this is received and should be received by the court and given such weight as in its judgment this testimony merits. On this theory, any ruling of the court heretofore made to the contrary, such testimony is at this time permitted and accepted, to be by the court weighed and given such weight as in its judgment it merits. And this ruling shall apply to the testimony of Mary Jane Worth and all other witnesses introduced by the claimants Vera Everly Garber and others."

The foregoing statement of the trial court has a most important bearing upon the question, much disputed throughout the hearings, as to whether the matters in issue were equitable in nature, and were being tried as equitable proceedings. At the hearing in December 1935, the Clark claimants introduced evidence in support of all issues involved in their claim, except as to whether heirs of the blood of the decedent could be found. The Administrator was an active participant in the hearing, as were other claimants. The evidence was introduced and the hearing was conducted as an equitable proceeding. This hearing was continued solely to permit an investigation and report thereof to the court by the appointed referee. The Everly claimants then came into the proceedings, and also the State of Iowa, and there were further continuances of the original hearing, at which testimony was introduced by each set of claimants. Some of the issues were essential to the establishment of both claims. The court ruled that each set of claimants was entitled to the benefit of any evidence introduced by either at the original hearing and all hearings subsequent. In the final determination of the case the court states that the testimony of many witnesses offered by the Everly claimants, and admitted and then stricken, was readmitted and considered by him, notwithstanding his rulings during the trial to the contrary. Further-

more the court appointed a referee to investigate and report to the court. The report was filed and the court stated that he would have to give it consideration to make up his mind. Six weeks after the final submission a supplemental report of the referee was filed and considered by the court in arriving at its judgment. Such proceedings of reference are wholly foreign to an ordinary proceeding at law. The court was right in its procedure in finally deciding to treat each set of claimants alike in the presentation of its evidence, although the Everly claimants had been unduly hampered.

It is our judgment that the causes were tried as equitable proceedings in equity, and they will be tried and determined by us de novo on these appeals. Whether the appeal should be treated by us as one in equity or at law, would make no difference in our decision, because there is no evidence worthy of consideration to support the fact findings and conclusions on which the judgment is based.

We will first consider certain issues of fact which both sets of claimants must establish if they are to recover. These issues are: First. In the words of section 12026, Code of 1935, were heirs of Sadie F. Clark, as designated in the Code sections just preceding, *"not thus found"*? Second. Was Albert A. Clark the husband and spouse of Sadie F. Clark at the time of his death?

In answering the first question, it may be noted that Sadie F. Clark died intestate, and that the statutory provisions relative to the descent and distribution of an intestate's property are found in certain sections of chapter 508 of the 1935 Code of Iowa. Certain of these sections provide to whom the property descends under specified circumstances. Immediately following these sections is section 12026, which states:

*"If heirs are not thus found,* the portion uninherited shall go to the spouse of the intestate, or the heirs of such spouse if dead, according to like rules, * * *."* (The remaining portion of the section has no application under the record.) (Italics ours.)

Each group of appellants bases its right to recover upon the fact that heirs of the intestate were not thus found, and that Albert A. Clark was her spouse, and is dead, and they are his heirs, "according to like rules"—the rules of descent specified in the preceding code sections.

Daniel T. Sullivan was the Administrator of the decedent's estate and, under code section 11913, he was required to ascertain and file a list of the heirs of the decedent, specifying the relationship of each. He had known the decedent for 15 years, during which time he had been one of those actively in charge of her person and property, and the administration of her husband's estate. He and his associates had repeatedly sought to ascertain from Sadie F. Clark some information as to her family, relatives and prospective heirs. They learned of no such person. Consequently, as Administrator, he was not able to comply with section 11913, and so notified the court. He was then given a 60-day extension in which to file such list, and on his application repeated extensions were given, while he searched diligently and widely over a period of 19½ months, until August 14, 1937. As a witness, and in his report, as referee, he stated that he found no one who was an heir of the decedent. It is conceded by all participants herein that no such heirs have been found. There is no support in the record for a different conclusion. The Administrator reports that there is no claim filed or pending in the estate, by any claimants other than the appellants. But the appellees contend that the appellants must go farther and establish by proof that no such heirs exist. The statutes place no such burden upon them, nor is it reasonable to suppose that the legislature so intended. The degrees of heirship are without limit in Iowa, and while it may perhaps be possible that a person could leave no heirs, it is a remote possibility. If it were required to establish by proof that no heirs existed before it could be said that property was "uninherited," section 12026 under which the appellants claim, and the escheat sections, under which the appellees claim, would all be rendered of no effect whatsoever. We find no merit in this contention of the appellees.

■ The trial court wholly disregarded the finding of fact which the referee had made and reported after months of search and investigation by himself and others, notwithstanding the finding was as to the very matter for which the court appointed him. The referee had investigated every rumor and clue, and sifted the chaff and found no grain of fact, except the absence of any heirs.

Only one person was used as a witness by the appellees, and she was Alice Davis, who was put on the stand by the Administrator. She was the only witness who gave any testimony respecting relatives of the decedent. She was a colored lady who began working in the Clark apartment in 1896 and continued to so help for a number of years. She testified that on just one occasion during those years, which was about a year after commencing work, Mrs. Clark spoke some of her past. Her testimony in substance was, that Mrs. Clark said that she left her home in Pittsburgh because her mother took her money when she worked; that she went to Cincinnati; that the initial "F" in her name stood for Frederika; that Mrs. Clark never told her her maiden name or her mother's name or any other fact about herself, except as disclosed in the following interrogation:

"Q. State what if anything she said about having left anyone in Cincinnati. A. Well, when she left Cincinnati she said she left —— she lived with his people, and she left the baby with his people.

"Q. Did she give you any further explanation as to what she meant by 'his'? A. After she spoke of that, then she seemed to stop on that subject, she never talked much about it."

The above-stated testimony of this witness of one casual conversation, approximately 40 years before she was a witness, is all of the direct testimony or evidence in the record upon which the conclusions of the court as to the possibility of existing heirs is based. All else is mere rumor, gossip, inference, and hearsay statements, two or three times removed from the declarant, to which no witness even offered to testify. Notwithstand-

ing this, the court, in its judgment, said: there are "statements of at least five highly reputable witnesses with no interest whatever in the outcome of this litigation, who state positively that Sadie F. Clark told them that she had been married and that she had run away from her husband and did have a baby girl, and that she left the baby girl with her husband's people, and that her name was Sadie F. Moore or More or Mohr, the three words having the same or very similar pronunciation."

The only evidential basis for this statement is the testimony of Alice Davis above set out. There were no other witnesses, reputable or otherwise, who so testified. Some information on the repute of these alleged witnesses may be inferred from this reference thereto by the State's attorneys in their printed argument, to wit: "A woman in a house of prostitution telling at least four of her *then woman acquaintances* that she was married." Who they were we do not know except that they were women associates of the decedent during the years when she was an inmate of a house of prostitution. They are nameless in the record, and they were never before the court. What the referee reported about these people is, of course, the purest hearsay. His statement is:

"One lives in St. Louis, one in Omaha, and one in Chicago. I didn't talk with the person in St. Louis, but I did talk with the one in Chicago and the one in Omaha. I also had information *and understood it to be a fact* that there was an additional person in Chicago to whom Sadie Clark told the same thing, *but I did not talk to that person.* So that altogether there would be five instead of four persons to whom Sadie Clark told she had a daughter, *if I counted this other person in Chicago.*"

The referee refers to a Mrs. Thomas, whom he interviewed in Michigan, who knew Mrs. Clark prior to 1890, and who said she had told her of having been married and having had a daughter. The referee further stated:

"I located and met a man in Cincinnati who claimed that in 1886 he had met and lived with a girl whose name was Sadie.

That was the only definite thing he could tell me with reference to the name of this girl he met.''

Some pictures were also found among the Clark effects— one of Mrs. Clark, another of a man, and one of a little girl. The Administrator traced these to the photograph galleries where they may have been taken, but no one had any recollection of the persons who sat for them, nor could the last two pictures be connected with anyone having any connection with the decedent. Alice Davis, as a witness testified that she was familiar with all of the pictures in the Clark home and that there were none that Mrs. Clark ever said were of any relatives. In the referee's report is the following statement which is fairly illustrative of the vague rumors which came to him, to wit:

''That your administrator also has in his possession the picture of a man given to him by *a person* to whom Sadie F. Clark had given said picture; while said Sadie F. Clark did not *perhaps* make a positive statement, it was and is *the impression* of *said person* that said picture is one of a previous husband of the said Sadie F. Clark, who *might have been the father of the daughter of Sadie F. Clark, if any she had.*'' (Italics are ours.)

Someone else suggested that this might have been the picture of a man to whom she may have been engaged. From his investigation of the child's picture, the referee reports ''that there is nothing on said picture to identify said child, and said administrator has to date been unable to learn just who said child is.''

Appellees' counsel refer to the fact that early in her acquaintance with Albert A. Clark, she was referred to as Mrs. Sadie Moore, as indicating her previous marriage. However, on this point the Administrator reports that he ''is informed that Sadie F. Clark stated that she had used the name of 'Moore', administrator is informed that was the name of some man of whom she had been the mistress before coming to Omaha.''

The fact that the appellation "Mrs." appears before a woman's name does not alone constitute legal evidence that she had been married. Blair v. Howell, 68 Iowa 619, 28 N. W. 199.

The court in its judgment states "it is shown further by several of these witnesses that Sadie F. Clark was in the habit of getting mail at the general delivery at the post office in Council Bluffs under the name of Sadie F. Moore." The only thing wrong with this statement is that there is not only no evidence whatsoever to support it, but there is also no rumor, report, or the slightest intimation in the entire record to that effect. It is mentioned for the first time in the court's judgment.

The court also rather disparages the testimony of Mary Despecher that Albert told her in 1890 that he and Sadie were married the week before, by a justice of the peace, because the report of the census enumerator states that Mrs. Clark told him in 1900 that she had been married for 6 years. Whether they were married in 1890 or 1894 is of slight importance, but the court makes no comment upon the highly important fact that in this same census report Mrs. Clark stated that *she had no child living and that she had never had any children.* While this is a hearsay statement, yet because of the circumstances under which it was made, and because it is a part of a public record, the record itself would have been admissible as an exception to the hearsay rule, had the Administrator discovered it before the final submission.

The court further states that she might have had a living spouse from whom she had not been divorced, and that if she had had a daughter, it raises the point "whether the said daughter did not have children of her own who under our laws would have the right to inherit." These are mere speculations of the court without any factual or evidential basis.

With the exception of the reported statement of a Mrs. Thomas to the Administrator, which is not evidence, there is no evidence that Mrs. Clark from 1890 on ever received any letter or communication from anyone claiming to be of her own family, or that she ever sent a communication to any such person, and 'for 25 or more years before she died she was under

such personal care that the receipt of any such letter or communication would have been known. Alice Davis in her years of work in the house never saw any such letter.

Dr. Arthur C. Brown, whom the court speaks of as a "highly reputable and experienced physician and surgeon" who had given Mrs. Clark his professional attention for several years and had given her physical examination at different times, testified that he found no physical indications that she had ever given birth to a child, and that in his opinion she had not. Such also was the opinion of the experienced matrons who had cared for her. She had also told one of them that she had never had a child. To Mr. Innes, a businessman and old friend of Albert Clark, who assisted in the latter's place of business for a time, and who knew the decedent well, she often mentioned her regret that she had no relatives that she knew of. There was much evidence of a similar nature from a number of the claimants which we disregard because of the questionable competency of the witnesses. Under the entire record we are satisfied that the appellants have definitely established that heirs of her own family and lineage, either through blood or marriage, have not been found.

It is also our conclusion that the record clearly establishes that Albert and Sadie Clark were husband and wife, and that he was her spouse at his death. It is true that the administrators of the estates found no certificate of marriage among their effects, and no official record of the marriage in Chicago or Pottawattamie county, the only places where a search was made. But such evidence is not necessary to prove that a marriage relation existed, and its absence does not prove that the relation did not exist. In Smith v. Fuller, 138 Iowa 91, 95, 115 N. W. 912, 914, 16 L. R. A., N. S., 98, the court said:

"There is no record evidence of any such marriage in Missouri, as claimed by plaintiff; but such testimony is not required to show the marital relation. That may be established by direct testimony of eyewitnesses, by testimony of one of the contracting parties, by admissions and confessions of the parties

while living together, by testimony as to cohabitation, and repute during the time the parties are living together and by other recognized legal testimony.'' State v. Wilson, 22 Iowa 364; State v. Nadal, 69 Iowa 478, 29 N. W. 451; Hanford v. Hanford, 214 Iowa 839, 240 N. W. 732.

Under the record herein no presumptions can aid the appellees in their contention that no marriage relation existed between Sadie and Albert because she already had a spouse. If presumptions are to be indulged in they are in favor of innocence and not guilt. The proof of their status of marriage is such that the burden was upon the appellees to show the contrary. Farr v. Farr, 190 Iowa 1005, 181 N. W. 268; Smith v. Fuller, supra; Hager v. Brandt, 111 Iowa 746, 82 N. W. 1016; Blanchard v. Lambert, 43 Iowa 228, 22 Am. Rep. 245; Brett v. Brett, 191 Iowa 262, 182 N. W. 241; In re Estate of Edwards, 58 Iowa 431, 10 N. W. 793. In Farr v. Farr, supra, and in Leach v. Hall, 95 Iowa 611, 617, 64 N. W. 790, 792, we quoted with approval the following from Bishop on Marriage and Divorce (6th Ed.) section 457, to wit:

'' 'Every intendment of law is in favor of matrimony where a marriage has been shown in evidence, whether regular or irregular; and, whatever the forms of proofs, the law raises a strong presumption of its legality, not only casting the burden of proof on the party objecting, but requiring him throughout in every particular plainly to make the fact appear against the constant pressure of this presumption that it is illegal and void.' ''

We have already referred to many items of evidence tending to show that the marital relation existed. Many other witnesses testified to their mutual references to each as the spouse of the other, to their always conducting themselves as husband and wife, to their cohabitation as such, and so holding themselves out to the public, to their recognition by the public generally as such, to the family tradition that they were married, to the general reputation in the communities where they were

known, to the fact that Sadie wore a wedding ring, to their execution of various business and official papers as husband and wife. There is no evidence to the contrary, and this relationship was never questioned for over 40 years, until it became necessary to make a distribution of the property.

 Coming now to the Clark claimants. It is undisputed that Mary Frances Despecher, Mittie J. Sauer, Martha A. Wedge, claimants, and the father of Lydia A. Hollingsworth and her five brothers and sisters, claimants, and the mother of George F. Morse, and Albert A. Clark, were all born of the same mother. In other words all of these claimants are children or grandchildren or great grandchildren of the mother of Albert. There is no question then of their relationship to both Albert and Sadie Clark.

 The Everly claimants have a more difficult task since they base their right to recover upon the alleged fact that their grandfather, Leonard Everly, was the father of Albert A. Clark, and that such relationship had been mutually recognized by each, as required by Code section 12031. In seeking to establish this relationship they received no help from the Clark claimants. Owing to the fact that this relationship dated back to 1860 the difficulty of securing proof is apparent. While there is little doubt that Albert spent considerable time in his mother's home in Council Bluffs, after her return to that place in 1866, there is just as little doubt that he spent a number of years in the homes of Burdict, Peter Hopley and Simeon Wright in Western Cass and Eastern Pottawattamie counties, before going to Council Bluffs in the late seventies to make it his future home. For a number of years he made his home with Simeon Wright. Many elderly witnesses testify to that fact. Three of them lived in the Wright home for from several months to several years during the time that Albert was there. With scarcely an exception all of these witnesses, who had lived in that locality, many of whom knew Albert personally, and also knew the Everly family, and branches of the Page family, testified that it was general and common repute in the community, that Albert was the illegitimate son of Leonard Everly. Joseph

Everly, a brother of Leonard, had taken Adelia Page, a sister of Albert's mother for his second wife. Witnesses who were familiar with the history and traditions of both the Everly and Page families testified that it was the belief, tradition and reputation in both families that Leonard was the father of Albert. There was testimony of the close family resemblance between not only Albert and Leonard Everly, but between Albert and the legitimate Everly children—testimony that Albert resembled Leonard even more than the latter's legitimate sons. Leonard Everly was a shrewd trader, and Albert had the same trading faculties to a still greater extent. Simeon Wright and Peter Hopley were well acquainted with Leonard Everly. Wright had taken Albert into his home when but a boy. He was in a position to know something about him and his parentage. A number of witnesses with no apparent interest in the case, testified that Wright had told them that Leonard was the father of Albert. No witness disputes any of this testimony. Cass county had about 1,600 inhabitants when Albert was born and the relations and acquaintances of these pioneers were much closer than in the later years. There is ample support for the contention that Leonard Everly was the father of Albert.

Was there such mutual recognition as Code section 12031 requires? Leonard Everly died in 1871 when Albert was a little more than 10 years old, so that the time and opportunity for mutual recognition while both were living was limited. We have referred to the witness Mary Jane Worth. She was born in 1852. When she was about 10 years old she was playing with the children in the Leonard Everly home. At that time Leonard brought Albert, then two or three years old, from Council Bluffs, into the house and asked his wife to take the child into their home and raise him with their children, as he was his child, and his mother was demanding money and threatening to prosecute him. His wife told him to take his bastard back to Council Bluffs or she would kill the child. Leonard that night or the next day took the boy to Burdicts and then back to Council Bluffs. It is fair to assume that Everly did not take the child to his home voluntarily but on the demand of the child's mother.

She was leaving for the West about the year 1863. Mrs. John R. Black testified to having heard Mrs. Leonard Everly tell to others the incident as above related, at about the time of its occurrence. The letter of John R. Black, for many years a well-known resident of the community and a county official, also confirms this testimony. He states that his father and Leonard Everly were as close friends as two men could be, and that Everly told his father that the child was Everly's.

There is no evidence that Albert ever recognized Leonard as his father during the latter's lifetime, and this could not be expected because of the immaturity of the boy. But if many witnesses are to be believed, and there is nothing in the record to cast doubt on their testimony, Albert became convinced as he grew older that Leonard Everly was his father. He was told by close friends of Leonard Everly and of himself that Everly was his father, and these same friends introduced him to the Leonard Everly boys as their half brother. He referred to them as his brothers. He befriended them, and gave Charley Everly (Leonard's son) employment in his office at Omaha. He expressed concern over the health of Charley, and when the latter committed suicide in the Paxton Hotel, he telephoned Harry Hopley and said "brother Charley shot himself," and asked Hopley to arrange for his burial in the last burial space in the Leonard Everly grave lot. He paid the funeral expense at Omaha, and attended the funeral. After the death of Ed Everly (son of Leonard Everly) in 1902, he sent presents and Christmas gifts to the widow and children for a number of years. One of the children, Leighton Everly, when 13 years old, visited him at Council Bluffs, and he gave him spending money and a twenty-two rifle. He asked the mother if he might adopt Leighton who looked very much like Albert. Harry Hopley was a grandson of Joseph Everly, by the latter's first wife. His stepmother was a sister of Albert's mother. Albert always referred to him as his cousin. He and his wife visited in the home of Harry Hopley and in the home of Harry's father many times. Harry repeatedly heard him speak of Leonard Everly as his father, and when referring to the latter's trading ability he

many times said that he must have inherited his trading and money-making ability from him. There is no contradiction of any of this testimony or the slightest intimation that anyone, other than Leonard Everly, was the father of Albert.

The fact that Albert recognized Everly as his father has some tendency to indicate that Everly had recognized Albert as his child. Every person is interested in his parentage, and a child whom the common law designated as "filius populi," a son of the people, would be interested in ascertaining just which one of the people was his father. As Justice Evans, in McKellar v. Harkins, 183 Iowa 1030, 1044, 166 N. W. 1061, 1066, whimsically states, he never knew of much contention for the honor, and "As a matter of common observation, it may safely be said that the illegitimate child has usually been glad to acknowledge the paternity which first extends the arms of acknowledgment to it." Albert must have ascertained by evidence that was satisfactory to himself, at least, that Leonard Everly was his father, and if the evidence convinced him that he had extended the arms of acknowledgment to him, we ought not be too critical of the evidence of that fact in the record before us.

In the record is a letter of one of the pioneers of the community, acquainted with Albert and the Everlys, whose father was an intimate friend of Leonard Everly, which states:

"Mr. Everly told my father all about the kid. Said he knew he was his. And wanted to take him home to raise. But his wife said no! She would kill him if he did not take and keep him away. My father tried to talk to Mrs. Everly. But no use. She said she knew the boy was his but she would kill him before she would take him in her family. Later on when Albert was just a little boy, he ran away and came out and Mrs. Wright took him in and he lived there until he could earn his own living. No question about Albert's dad. He believed and always thought he belonged to the Everly family."

The writer of this letter, John R. Black, about 1896, introduced Edward Everly and Albert A. Clark to each other as half brothers, and told them they should know each other and

be good friends. The boys shook hands at this time. He would hardly have done this had he not from his intimacy with Leonard Everly known that they were half brothers. When Ed Everly died in 1902, Albert befriended the widow and children.

There is ample proof that Albert considered and recognized Leonard Everly as his father. The opportunities for recognition of Albert as his son, by Leonard Everly, were limited by the circumstances. The boy was not in the neighborhood part of the time. He was with his mother or grandmother during his earlier years, but when demand was made upon him to take the child and care for him, he did it openly. Going to Council Bluffs for the child, taking him to his home and admitting the parentage to his wife in the presence of a neighbor's 10- or 12-year-old child, from whose mind the threat of the wife would never be erased. He then took the child to Burdicts, and later returned him to Council Bluffs. Recognition may be by acts and conduct as well as by words. As has been stated in a number of our decisions, the extent and nature of the recognition depends upon the circumstances and conditions, and these must be considered in determining whether the requirement of the law is met. The question has been passed upon many times by this court, but the circumstances in each case are so different that they have little value as precedents. Trier v. Singmaster, 184 Iowa 307, 167 N. W. 538. In Blair v. Howell, 68 Iowa 619, 28 N. W. 199; Morgan v. Strand, 133 Iowa 299, 110 N. W. 596; In re Estate of Wise, Schermerhorn v. Snell, 206 Iowa 939, 221 N. W. 567, and other cases, the heirship of the illegitimate was upheld, though the evidence of recognition was not strong, but was as wide and open as the circumstances admitted. There is no testimony that Leonard ever denied the paternity and no testimony that there was any general reputation or belief in the families or the community that anyone other than Leonard Everly was the father. Albert's recognition of Everly as his father confirms and corroborates the admissions and recognition of Everly, and the recognition and belief of the families and the public. As stated in Trier v. Singmaster, supra [184 Iowa 307, 318, 167 N. W. 541]:

"A general and notorious recognition does not necessarily mean a continuous recognition, covering the whole period up to and including the time of death of the putative father. *A recognition clearly shown to have been once deliberately and publicly made, made under circumstances that reveal no apparent motive to conceal, meets the requirement of the statute.*"

Confronting his wife with the child of his indiscretion was no pleasant task to Leonard Everly, and not of his own choosing. The truth of what he told his wife cannot be doubted. She was convinced of its truth and so told others.

It is our conclusion that the Everly claimants have established that Leonard Everly was the father of Albert A. Clark, and that there was such recognition of that fact by each of them as stated in Code section 12031. There is no question that these claimants are the grandchildren of Leonard Everly.

There remains for determination but one question, and that is one of law. The appellees contend that notwithstanding the Everly claimants and the Clark claimants are respectively the children of deceased children of the father of Albert A. Clark, and the children, or children or representatives of deceased children, of his mother, they are nevertheless not heirs of Albert A. Clark, and therefore are not entitled to the estate of Sadie F. Clark. They contend that they are not heirs of Albert because he was an illegitimate child and his inheritable blood line stopped with his parents, and no one beyond or through them can be his heirs. That is the question.

Just why a person, begotten and born out of lawful wedlock, an innocent victim of the indiscretion of his parents, should have received the odium of the church, state, and all society, and have been denied the right to inherit property from any ancestor, not even excepting his father or mother, is a matter which is difficult to understand, and unnecessary to discuss. This court has characterized it as "one of the reproaches of the common law, which has shocked the legislative and judicial conscience of the civilized world." McKellar v. Harkins, 183 Iowa 1030, 1043, 166 N. W. 1061, 1066. The harshness and the

extent of the disadvantages of his unfortunate birth, particularly with respect to the right to receive and transmit by inheritance, have been greatly relieved by legislation in every country. Such legislation was first enacted in Iowa as a territory, and it has continuously remained in our statutes since that time.

Section 12030 of the Code provides that "Illegitimate children inherit from their mother, and she from them."

Code section 12031 provides that illegitimates "shall inherit from the father when paternity is proven during his life, or they have been recognized by him as his children; but such recognition must have been general and notorious, or else in writing. Under such circumstances, if the recognition has been mutual, the father may inherit from the illegitimate children."

Legislation of this kind, notwithstanding it is in derogation of the common law, but because it is remedial in its nature, and the purpose of its enactment was to alleviate the rigor of that law, has uniformly been most liberally construed to effect its purpose to the fullest extent. 7 Am. Jur. sections 3, 152; 64 A. L. R. 1124. Such liberal construction has been the policy of this court in every case which has come before it involving the right of inheritance under the above-quoted sections. McGuire v. Brown, 41 Iowa 650; Milburn v. Milburn, 60 Iowa 411, 14 N. W. 204; Van Horn v. Van Horn, 107 Iowa 247, 77 N. W. 846; Brown v. Iowa Legion of Honor, 107 Iowa 439, 78 N. W. 73; Johnson v. Bodine, 108 Iowa 594, 79 N. W. 348; Alston v. Alston, 114 Iowa 29, 86 N. W. 55; Goulding v. Phillips & Lansing, 124 Iowa 496, 100 N. W. 516; Brisbin v. Huntington, 128 Iowa 166, 103 N. W. 144, 5 Ann. Cas. 931; Watson v. Richardson, 110 Iowa 673, 80 N. W. 407; Lepper v. Knox, 179 Iowa 419, 161 N. W. 454, L. R. A. 1918A, 43; Booz v. Booz, 183 N. W. 381, 167 N. W. 93; McKellar v. Harkins, 183 Iowa 1030, 166 N. W. 1061; Hastings v. Rathbone, 194 Iowa 177, 188 N. W. 960, 23 A. L. R. 392; In re Estate of Ellis, 225 Iowa 1279, 282 N. W. 758, 120 A. L. R. 975.

This court has said that these statutes are only statutes of descent, "and do not undertake to change the status of the

bastard. He is illegitimate after recognition, precisely as before." The recognition does "not remove the taint of illegitimacy." Brisbin v. Huntington, 128 Iowa 166, 175, 180, 103 N. W. 144, 148, 149, 5 Ann. Cas. 931. Of course the "taint" remains. Once illegitimate, always illegitimate. Even the legislature of Iowa cannot perform miracles. It cannot by its fiat change a birth out of lawful wedlock to one in lawful wedlock. Neither adoption nor code section 10444, providing that "illegitimate children become legitimate by the subsequent marriage of their parents," removes the taint or changes the marriage status of the illegitimate's parents at its birth. Because of the status of their parents, legitimation by subsequent marriage is impossible with many illegitimates. At common law and in Biblical times the illegitimate suffered many other legal penalties and disadvantages in addition to that of lack of inheritable blood. Perhaps the only legal disadvantage recognized in this country was the latter. The purpose of the legislature in enacting sections 12030 and 12031 was to make the blood stream of the illegitimate inheritable. As stated in State v. Hastings, 74 Iowa 574, 576, 38 N. W. 421, 422:

"By this recognition the child stands in the same relation to him as though born to him in lawful wedlock."

Such purpose has been uniformly recognized in our decisions. In McKellar v. Harkins, supra [183 Iowa 1030, 1045, 166 N. W. 1061, 1066], we said: "It is urged, also, that the statute which confers the right of inheritance upon the illegitimate does not change its status as an illegitimate. This may be conceded. It was so held in Brisbin v. Huntington, 128 Iowa 166, 175. But this does not reduce the effect of the statute which confers upon the illegitimate the right of inheritance. Though illegitimate, her disabilities as to right of inheritance are lifted by statute. Her paternity being proved with that certainty required by the statute, *her biological blood line becomes endowed with the right of inheritance."* (Italics ours.)

In that case the court held that the children of a deceased illegitimate mother could inherit from her father. It was con-

tended by the legitimate children of the father that while the illegitimate daughter under the statute could have inherited from the father, had she lived, the statute did not carry such right to the descendants of the illegitimate daughter. The court refused to accept such narrow construction and held that the biological bloodline of the illegitimate became endowed with the right of inheritance and carried on through. If the biological bloodline endowed with the right of inheritance did not stop with the illegitimate mother, can it be said that the biological bloodline, also so endowed, of Albert A. Clark, stopped with his father and mother?

The appellees contend that the code sections defining who shall take by descent, preceding sections 12030 and 12031, with particular reference to section 12025, have no application to illegitimates, and one reason which they advance therefor is that the word "parents" "does not have such a meaning that it can be applied to those who begot a bastard." They cite certain dictionary definitions and some authorities which in particular instances and under certain circumstances so held. They say that the proper legal term for those who beget illegitimate children is "father" and "mother" but never "parent". They cite the use of the term "father" in section 12031 and the term "mother" in section 12030. Webster's Twentieth Century dictionary defines "mother" as a female *parent*, and "father" as a male *parent*. The legislature of Iowa has been content with these definitions, and in speaking of those who beget illegitimates has invariably used the term "parents". See section 10444, just quoted herein, and also code sections 10501-b3, 3661-a84, 3661-a85, 12667-a1 [Code, 1935]. This court has never made the distinction urged upon us by the appellees and we decline to do so at this time. In determining the descent of property where an illegitimate was involved the rules of descent as provided by statute have always been followed. In Hastings v. Rathbone, 194 Iowa 177, 184, 188 N. W. 960, 963, 23 A. L. R. 392, supra, and speaking through Justice Faville, we said:

"It is, then, the rule in this state that an illegitimate child

whose paternity has been recognized or established as required by our Code becomes entitled to all of the rights of a legitimate child, *so far as the general laws of descent and inheritance are concerned.* The plain and obvious purpose of the. legislative enactments was at least to provide that a duly recognized illegitimate .child should have all the rights of inheritance of a· legitimate child.''

The chief reason for denying inheritable blood to an illegitimate was because since the person of the father was usually in doubt, and oftentimes also the mother, the child was designated a child of nobody, or a child of the people. Real estate passed under .the primogeniture rule and the greatest care was exercised that there should be no chance of a spurious heir taking title. The reason for the rule is gone under our statutes which make the recognition of the parentage a requisite. When this has been done the child is not a child of nobody, but is a child of definite and known parentage. The reason for the rule is gone. As stated by Justice Evans, in McKellar v. Harkins, 183 Iowa 1030, 1043, 166 N. W. 1061, 1066, supra:

''The fiction that a bastard has no inheritable blood has been shorn of its reason in this state by legislation. It remains, therefore, a fiction only. Our legislation has conferred ·upon the illegitimate the right of inheritance, with appropriate safeguards as to the certainty of paternity. Why, therefore, should we deal with finespun theories of the common law as to inherit-able blood?''

In Milburn v. Milburn, 60 Iowa 411, 413, 14 N. W. 204, supra, we said:

''For the purpose of inheritance, ·an illegitimate child, when recognized by its father, stands on *precisely* the same footing as if it were legitimate. * * * *Such recognition legitimatizes the child.*'' (Italics ours.)

This language was quoted with approval ˈin Hastings v.

Rathbone, supra, and in reference to the first sentence we said in Lepper v. Knox, 179 Iowa 419, 421, 161 N. W. 454, 455, L. R. A. 1918A, 43:

"Though the foregoing be deemed dictum, it expressed what was in the mind of the court at that time, and it expresses its present mind likewise."

In the latter case the court also said:

"We are very clear in our minds that the purpose of the statute was to put the illegitimate child, when recognized by its father, on equality as to right of inheritance with legitimate children."

In McGuire v. Brown, 41 Iowa 650, the court held that the child of an illegitimate mother inherited through that deceased mother, and through the deceased parents of the mother a share in the estate of a brother of her mother. This went beyond the express language of section 2441 of the Revision of 1860 (now section 12030) but the court held that it was within the spirit and purview of the section as intended by the legislature.

In Johnson v. Bodine, 108 Iowa 594, 79 N. W. 348, the court held that the children of an illegitimate deceased mother were entitled to take through the deceased father of her mother, as heirs at law of a brother of her mother's father. This was also beyond the language of what is now code section 12031.

In speaking of the two decisions last cited, we said in Shick v. Howe, 137 Iowa 249, 253, 114 N. W. 916, 917, 14 L. R. A., N. S., 980:

"* * * these decisions are in harmony with the humane and enlightened policy of the statutes referred to, and as a liberal construction calculated to aid in effectuating their designs is enjoined upon the court, they should be adhered to."

In Hastings v. Rathbone, supra, it was held that the word "child" in section 3270, Code, 1897, prohibiting a bequest or devise to a nonpecuniary corporation in excess of one fourth of

the estate, included an illegitimate child whose paternity had been recognized.

In Booz v. Booz, 183 Iowa 381, 167 N. W. 93, supra, a duly recognized illegitimate child was held to come within the meaning of the word "heir" in a statute requiring beneficiaries of a fraternal association to be a husband, wife, "heir", etc.

In McKellar v. Harkins, supra, the children of an illegitimate deceased mother were held to be heirs of her father.

In McGuire v. Brown, supra, Johnson v. Bodine, supra, McKellar v. Harkins, supra, the inheritance in each case came down through the illegitimate to the taker. In the McGuire case the way traveled by the inheritance was from the brother of the illegitimate mother up through the parents and down through the mother to her child. Suppose this child had been the deceased ancestor and the brother of her mother the only living heir, could not the way traveled by the inheritance be reversed?

In the McKellar case, the inheritance traveled from the father of the illegitimate mother through her to the children of the latter.

In the Johnson case the inheritance traveled from the testator to his brother to the illegitimate daughter of the latter to her children. Under our decisions construing the statutory sections the illegitimate child after recognition has all of the rights of inheritance of a legitimate child. That means he has the same right to transmit an inheritance and to receive one as a legitimate child. The brother or sister, niece or nephew can therefore be the heir respectively of a brother or sister, or an aunt or uncle, regardless of whether the latter person is of legitimate or recognized illegitimate birth. To hold that the other children of his mother and the children of her deceased children, and that the grandchildren of his father, are not the heirs of Albert A. Clark, would be contrary to the spirit and legislative purpose of sections 12030 and 12031 as they have been interpreted by this court in every case submitted to it involving a similar question. We hold that all of the

appellants are heirs of Albert A. Clark and are thus heirs of Sadie F. Clark, and of her estate, under section 12026.

It is to be kept in mind that the property is not the property of Albert A. Clark. He gave it by will to Sadie F. Clark and it has belonged to her and to her estate since his death. Under section 12026, Albert A. Clark, as her deceased spouse, is simply the means by which her heirs are ascertained, and the conduit through which the estate passes, without stopping, to rest in those heirs. The appellants then are in fact heirs of Sadie F. Clark and are not in reality heirs of Albert A. Clark, except as a means of identifying them.

The judgment and decree is therefore reversed with instructions to enter a decree in conformity herewith granting to the appellants, Everly claimants, an undivided one half of said estate, and granting to the Clark claimants an undivided one half thereof, and to each individual appellant such share as his or her interest in the estate may appear from the record.

The motions to dismiss the appeal have been duly considered and are overruled.—Reversed and remanded.

SAGER, STIGER, HALE, OLIVER, MILLER, and RICHARDS, JJ., concur.