Anna Sinkora et al., Appellees, v. Mary Wlach et al., Cross-petitioners, Appellees, and John Blazek et al., Cross-petitioners, Appellants.

No. 47325.

(Reported in 35 N. W. 2d 40)

DECEMBER 14, 1948.

Jordan & Jordan, L. M. Hullinger, and W. R. Watsabaugh, all of Cedar Rapids, for appellants.

Richard F. Nazette, M. W. O'Rieley, and Otto L. Schluter, all of Cedar Rapids, and M. W. Hyland, of Tama, for appellees.

BLISS, J.—The action was tried on the cross-petition of John Blazek and Kate Herman and the answer thereto of the plaintiffs and the other defendants. The only issue tried below or submitted on appeal is the right of these two cross-petitioners to share in the real estate or its proceeds.

Joseph Kladivo, eighty, died in Linn County, Iowa, on November 3, 1943, owning real estate in Linn county and Johnson county. His parents had preceded him in death. He apparently had never married, and left no children. On November 5, 1943, the defendant Mary Wlach, known also as Mary Vlach, filed petition for letters of administration on the estate of the deceased, which were granted the same day. Later a will of the deceased was found. It had been drawn apparently by M. J.

Tobin of Vinton, Iowa, and was executed at that place by Kladivo on September 2, 1929. On December 10, 1943, Mary Wlach filed the will for probate, and it was admitted to probate on June 14, 1944, and Mary Wlach, on July 13, 1944 was appointed administratrix c. t. a.

The will, after directing the payment of debts, etc., and the setting aside of a fund for the perpetual care of his place of burial and that of his parents and brother, provided in paragraph 3, as follows:

"I give, devise and bequeath all of the rest, residue and remainder of my estate, share and share alike, to my first cousins or the heirs of their body born. It is my intention that all of my first cousins on my father's side and all of my first cousins on my mother's side, or the heirs of their body born, if any are dead, shall share my estate equally.

"Among my cousins on my mother's side are the following: Mary Vlach of Cedar Rapids, Iowa, is to have one share .* * *."

Then follows the names of several others who are to share in the estate. Among them the testator designated several by the names of Sokol, Miska and Kladivo. Frank Sokol was named as executor.

The petition filed August 5, 1947, of Anna Sinkora et al. named herself and Josef Peter and others as first cousins of the testator, and numerous others as heirs of deceased first cousins. Mary Wlach was named as- defendant, but plaintiffs alleged they had insufficient knowledge or information to form a belief as to whether she was a first cousin of the testator, and therefore denied that she was.

On August 16, 1947, Mary Wlach et al., "defendants and additional defendants," filed answer and cross-petition. In the answer they admitted many of the allegations of the petition and denied others, and named eight other persons, additional to the defendants named in the petition, as beneficiaries under the will. The cross-petition was in fact a complete petition for the partition and sale of the real estate. It eliminated some, named as beneficiaries under the will in the petition, and alleged a complete list—thirty-five in all—of plaintiffs, defendants and cross-petitioners, as such beneficiaries, giving their names and respec-

tive shares. It was the contention of the cross-petitioners that the testator had thirteen paternal and maternal first cousins, and that each living first cousin was entitled to a one-thirteenth share of the estate, and the heirs of any deceased first cousin would divide such a share among them.

The cross-petition alleged that the additional defendants, John Blazek and Kate Herman, named therein, claimed to have some right, title, or interest in the real estate. The cross-petition denied this claim.

On September 22, 1947, John Blazek and Kate Herman filed their separate answer to the petition, and also filed a cross-petition. They joined in the answer filed by Mary Wlach et al., except paragraphs 11 and 18 thereof. In their cross-petition they named the identical beneficiaries listed in the cross-petition of Mary Wlach et al., and added the names of John Blazek and Kate Herman. In other words they claimed the testator had fifteen first cousins, including themselves, each of whom, if living, was entitled to a one-fifteenth share of the estate. The impossibility of their contention will later appear.

Since our review is de novo, a discussion of the evidence is necessary. The trial commenced on December 22, 1947. John Blazek was born, apparently in Bohemia, March 15, 1874. Kate Herman is his sister and is five years older than he. Both live in Cedar Rapids. He testified that he and the testator were good friends and had known each other for over sixty years and that he had built the testator's home in Cedar Rapids. He testified that Mr. Kladivo was about six or eight years older than he. Blazek testified he knew the testator's father. His name was also Joseph Kladivo. He testified that his father's name was Daniel Blazek and that his father's sister, Anna Blazek, was the first wife of Joseph Kladivo, Sr., and that Joseph Kladivo, Jr., the testator, was the issue of that marriage; that Anna, the first wife died, and Kladivo, Sr. then married another woman. He testified that Kladivo, Sr. and his second wife often visited in the home of his (Blazek's) father, and he heard his father and the testator's father talking about this relationship. He also testified that Kladivo, Jr. had told him that his father had been married twice, and that he was a son of the first marriage.

1396

On cross-examination Blazek, with some equivocation and evasion, testified that on October 29, 1947 in a trial in Cedar Rapids, apparently involving the partition of the Linn county real estate, he had testified that he "didn't think" Kladivo, Sr. had been married more than once, as far as he knew. It was stipulated that Kate Herman, who was unable to testify, would, if she were able, testify that Anna Blazek, the sister of her father, Daniel, married Joseph Kladivo, Sr.

In support of Blazek's testimony, one witness testified that, about twenty years back, the testator had told him Blazek was his first cousin. Another witness, without fixing the time, testified that the testator told him Blazek was his cousin, and the witness assumed he meant first cousin. The transcript of two witnesses in the earlier trial was read. One testified, without stating the time, that he heard Kladivo tell the witness' brother that Blazek was his cousin. The other testified that he had heard "my folks always say" that Joseph Kladivo, Jr. and Peter Kladivo were half brothers. On rebuttal, another witness, whose uncle married a Blazek, testified that he had known Kladivo, Jr. for about twenty years and had talked to him forty or fifty times, and on one occasion about a year before he died, Kladivo told him that he had married a Blazek.

No other evidence was offered by the appellants.

Mary Wlach, an appellee, one of the defendants and cross-petitioners, referred to in the testator's will as his cousin "on my mother's side" was a witness against Blazek and Herman. She testified in substance:

"I was born in Studnic, Czechoslovakia in the year 1876. My mother's maiden name was Anna Vasko. There were four children in my mother's family. Anna was the oldest, Frantiska, then Maria, and Joseph. Frantiska Vasko married Joseph Kladivo. My mother married Joseph Sokol. Maria married Jan Miska. Joseph married Anna Miska. He is dead. That left three girls, Frantiska, Anna, and Maria. I was maybe 15 months old when my mother died. I was taken from her three or four months before she passed away to the home of Frantiska Kladivo. She was my aunt, but I always called them father and mother. My mother's sister. I was about a year old when I

was taken to Frantiska Kladivo. I lived with her up until the time of my marriage. They had a son by the name of Joseph Kladivo. That is the Joseph Kladivo that died in Cedar Rapids and known as Joseph Kladivo, Jr. We lived together as brother and sister in the same family. He was about 12 years older. He always celebrated his birthday on the 15th of November. Always I heard Frantiska Kladivo, my aunt speak of Joseph Kladivo, Jr. as her son, and I always heard him speak of her as his mother. Up until his mother's death he lived at home. He took charge of the whole house always. We all worked together there. Joseph Kladivo, Sr. died in 1904. The mother of Joseph Kladivo, Jr. died in 1901. I was at the funeral of Joseph Kladivo, Sr. I did not see John Blazek at those funerals, either one of them. While I was living in the Kladivo family, I did not see John Blazek or his folks visit in the Kladivo home. They never visited in the Blazek home. About twenty years ago I saw Blazek doing some carpenter work at the home of John Kladivo, Jr. I saw him there and he said: 'John Blazek is helping me here.' I never saw or heard of Kate Herman until the last few days. Joseph Kladivo, Jr. and I grew up and were raised as brother and sister. We continued to visit back and forth until his death. I was standing by him when he died, by his bed. He never mentioned to me that Blazek was his cousin. I never heard from talking with Joseph Kladivo, Sr. and Frantiska his wife that he was ever married before he married Frantiska. I first heard that Joseph Kladivo, Sr. was married more than once when I began to come into court. The first time I ever heard it there in Cedar Rapids was when we had the last lawsuit. They were presenting he was married more than once. I never heard it from anybody else. I first heard John Blazek say that Joseph Kladivo, Sr. was married more than once today in court. I came to this country with Joseph Kladivo, Frantiska and Joseph Kladivo, Jr. My name before I was married was Mary Kladivo. I always went by that name. I registered in schools by that name. In this paper, Exhibit '4', I notice it says 'Mary Sokol', but I did not have that paper until here not long ago. This paper refers to Mary Sokol and I am the person referred to. [Exhibit 4 is a passport from Austria.] I came to this country with Mr. Kladivo, Sr. in 1881. I knew I

wasn't a sister to Joseph Kladivo, Jr.—we weren't a sister and brother—but we were brought up together and he would address me as sister, he would call me sister; sometimes he would also write in a letter 'sister'. Their second son was brought up in that family besides me and Joseph Kladivo, Jr. His name was Peter Paul. I was older than Peter. He died in 1913."

The witness identified a picture of Mr. and Mrs. Joseph Kladivo, Sr. and also one of Joseph Kladivo, Jr. She testified that Mrs. Kladivo and Joseph, Jr. each had blue eyes, hair the same color, and were built about the same—heavy set—and they acted much alike. These pictures have been certified to this court, and those of Mrs. Kladivo and Joseph, Jr. show a most striking resemblance to each other in their figures and features.

After the death of the testator, Leonard Vlach, forty-four, a son of the administratrix, whom he was helping in caring for the estate, found letters and other papers in a trunk in the woodshed at the home where the testator was living at the time of his death. Among these was a marriage record (Exhibit 3) and a passport. He delivered these to his mother, the administratrix. The passport is Exhibit 4 which Mrs. Mary Wlach referred to in her testimony. These papers were translated by Louis H. Straka, who has conducted a travel bureau at Cedar Rapids since 1920. He was born in Czechoslovakia, lived there and attended its schools until he was nineteen, and was quite familiar with its history, customs, and particularly, birth, baptismal, marriage, and burial records as kept by the churches, and papers necessary for entering and leaving the country. He testified that he spoke fluently English, Czech, German, Polish, Jugoslav, and Russian.

Exhibit 4 has been certified to this court. It is a booklet of sixteen numbered pages including the front and back. Each sheet is folded at the back to make four pages. The sheets are tied at the back by a silken cord laced through two perforations. Each page has a finely traced, figured scroll printed on it similar to the paper money of the United States. The paper is of a tan color and the entire document has the appearance of age. It is not a copy but is the original passport. Five of the pages

have printed notations with blank lines to fill in with pen and ink.

Concerning it Mr. Straka testified:

"This is a passport, Austro-Hungarian government passport, printed and written in German, as follows:

"Sixteen pages. No. 44. In the name of His Majesty, Francis Joseph I, Emperor of Austria, King of Bohemia, and Apostolic King of Hungary.

"Passport for Josef Kladivo, from Vorvola.

Character and occupation: House owner, living at Zajezdez in the county of Churdim, and district, same—Churdim. Personal description of the bearer: Year of birth, 1835. Stature: Middle. Face: Prolonged. Hair: Chestnut brown. Eyes: Blue. Mouth and nose: Regular. Special marks: None. Signature of the bearer: Josef Kladivo.

"3

"He is traveling to America. This pass is good for six months.

"4

"With him are traveling:

"Names and surnames: character: place of birth: age: single or married and description of face, hair and eyes. Frantiska Kladivo, wife. Place of birth, Studnic, 1836. Stature: Middle. Face: Oval. Hair: Chestnut. Eyes: Blue. Josef Kladivo, son, from Hloty; born in 1863. Stature: Middle. Face: Round. Hair: Chestnut. Eyes: Blue.

Marie Sokol, adopted daughter, Studnic; birth, 1876.

"5

"Given at the county seat of Churdim on the 23rd day of May, 1881. In the name of F————."

The witness then testified:

"The signature is pretty hard to read; I can't read it. And the name, evidently, of the court, and then another signature, and then his title, and then he signs it, but I can't read that. The signatures are not readable."

The witness testified that the passport was in regular, usual

and customary form that he had examined or used in his business and then had in his office. The exhibit was received subject to the objection that it was incompetent, irrelevant and immaterial to any issue in the case; had not been properly identified or authenticated; was not admissible under the rules of evidence of the state of Iowa; was not the best evidence and was hearsay and was not binding on the defendants.

Another witness against Blazek and Herman was Mrs. Anna Kvidera, a farmer's wife living near Dysart. She testified that she knew Joseph Kladivo, Jr., and that her father, whose name was also Joseph Kladivo, was a first cousin of the testator. Her grandparents were buried near Solon and each year as she and her husband went to care for the graves they would stop and visit the testator. She testified that in 1940 on one of these visits her father and mother and husband were along and she overheard the testator tell her father that John Blazek was there occasionally and was trying to make himself out to be a second cousin, and that when her father said: "Blazek? Why, have you any cousins by that name?" the testator shook his head "no" and said "you know better than that, but you want to look out, Joe, this Blazek will probably try to assert himself some day." Her husband corroborated her with respect to this testimony.

This witness also testified that her grandmother, who was a sister-in-law of Joseph Kladivo, Sr., lived with her family for many years, until her death in 1934, and that she often heard her talk about Frantiska Vasko as the first and only wife of Joseph Kladivo, Sr., and the mother of Joseph Kladivo, Jr.

The witness also testified that when they were leaving the church to go to the cemetery at the testator's funeral, the undertaker asked her if they had room for another passenger. She did not know him, but he got in the car and said he was John Blazek, a second cousin of Joseph Kladivo, Jr. He had not sat with the family at the funeral services.

The plaintiffs and defendants, other than appellants, also offered in evidence Exhibit 3, a copy of the parish record of the marriage on May 5, 1863, at Studnic in Czechoslovakia of Josef Kladivo, single, age twenty-eight years, born June 2, 1835, and the bride, Frantiska Vasko, single, age twenty-seven

years, born July 6, 1836. The exhibit is set out in full in the printed record, giving the book and page of the parish record, the parents of the parties, the attending clergyman, the three announcements of the banns, the two witnesses, one of whom was Josef Sokol. The final statement of the exhibit is as follows:

"Given at Parish House in Hlinsku. Day: 9th of May, 1913. Signed by Aug. Jonas, Chaplain, and sealed with the seal of the parish of the church of Saint Marie, Hlinsku." The seal is a purple rubber stamp. Affixed to the exhibit is a one-crown tax or revenue stamp.

The trial was closed on December 22, 1947, and on December 24, 1947, Mr. Straka received by airmail from Churdim, Czechoslovakia, a copy of the record of the baptism (Exhibit 8) from the parish of Kamenicky of Josef Kladivo dated December 17, 1947. After the trial the administratrix found among the papers of the deceased a certified copy of the same baptismal record dated May 27, 1913 (Exhibit 7).

On motion of the plaintiffs and defendants, except Blazek and Herman, the court reopened the hearing on January 6, 1948, to receive this new evidence.

Exhibits 3, 7, and 8 are each printed blank forms, with the printed and written matter in the Czech language. They were translated and read into the record by Mr. Straka, over objections similar to the objections made to Exhibit 4 set out above. Each respectively shows the geographical location of the record, and the books and pages thereof. Exhibit 9 is the envelope in which Exhibit 8 was received. The postal stamp of Kamenicky, Czechoslovakia, is December 18, 1947, and the postal stamps at Chicago and Cedar Rapids are dated December 24, 1947. The envelope has on it a return to the Kamenicky Parish and the rubber-stamp seal of the parish and church. Both Exhibits 7 and 8 bear the parish seal and the first has a one-crown glued revenue stamp, and the second has a similar twelve-crown stamp. (Twenty-four cents.) Each of the two exhibits purports to be a copy of the record of the baptism of Joseph Kladivo, the testator. The printed forms are somewhat different in the printed matter and the manner of set-up. Exhibit 7 was made when the Kingdom of Bohemia was in power and Exhibit 8 during the reign of the present Czechoslovakia Republic. While

made by different copyists at different times they are substantial transcriptions of the same record. Each sets out that Josef Kladivo on November 16, 1863 was born in wedlock, at Hloty No. 8 to his father, Josef Kladivo, Catholic, legitimate son of Martin and Victoria Kladivo, and to his mother, Frantiska, Catholic, legitimate daughter of Josef and Barbory (nee Svoboda) Vasko of Studnic No. 34, and was baptized on November 16, 1863, by Father Hynek Brozek, Cooperator. The name and residence of the midwife were given. The godparents were named as Jan Miska, homeowner, from Studnic No. 69 and Anna Kladivova (the feminine of Kladivo) from Hloty No. 20.

It will be noted that Jan Miska and Anna Kladivo, the godparents, were each mentioned by Mary Wlach in her testimony. The first named being the husband of Maria Vasko, the maternal aunt of the witness, and the second, Anna Kladivo, being the wife of Joseph Sokol, and the mother of the witness. It is significant of the worth of her testimony that when she testified she had not seen or known of either Exhibit 7 or 8.

Exhibit 8 is subscribed: "In witness whereof my own signature and official seal at the parish home of Kamenicky. Dated 17th of December, 1947. Father Josef Drinovsky, Administrator." The testimony shows that an "administrator" is appointed to perform the duties of the regular priest on his death or permanent absence pending the appointment of a successor.

Exhibit 7 is subscribed: "Dated at the parish house of Kamenicky the 27th of May 1913. Signed, Frant. Teska, priest," with the seal of the church in Latin—"Sigillum Ecclesia Kamenicky." and a drawing of the crucifixion—by rubber stamp.

There is nothing on the face of any of the Exhibits 3, 4, 7, 8 and 9 to arouse suspicion or to discredit them. All were received by the court subject to the objections. What consideration, if any, the court gave to any of them does not appear. The court filed no specific findings of fact or conclusions of law. But in the decree, entered January 27, 1948, the court specifically found that the equities were against Blazek and Herman, and that they had failed to establish the allegations of their crosspetition, and failed to establish that they were first cousins in conformity with paragraph 3 of the probated will of the testa-

tor Joseph Kladivo, Jr., and thereby entitled to share in his estate.

We are abidingly convinced that the able trial court rightly decided the case and that the decree of the district court should be sustained. We reach this conclusion even though the above-noted exhibits be not considered and the evidence be limited solely to the testimonial evidence of the witnesses. The testimony of Mary Wlach and Anna Kvidera was that of interested witnesses, as was that of the two appellants, but the latter testimony was supported only by evidence of alleged declarations of the testator made several years before his death, and on occasions which did not conduce to the weight of the testimony. Courts have many times commented on the infirmities of such testimony.

It is significant that if the testator was such an old-time friend and associate of Blazek as the latter testified and a first cousin of the testator, that the latter did not mention him by name as such in the will. He mentioned several others. The court found the list of beneficiaries alleged by the appellees to be correct except for the addition of two or three names.

It is quite evident that Blazek and his sister were rather chancing a leap in the dark. In their pleading they admitted that every person named in the cross-petition of Mary Wlach and others was a beneficiary under the will. They simply added their own names to this list. Their position is wholly without basis. It is bottomed on the contention that Anna Blazek was the mother of the testator. If it were true, then they were first cousins of the testator on the maternal side, and Mary Wlach and others were not. But it is equally true that Mary Wlach was a first cousin of the testator on his mother's side, and the appellants were not, if Frantiska Vasko was the mother of the testator. John Blazek and Kate Herman and Mary Wlach could not all be maternal first cousins of Joseph Kladivo, Jr.

■■■■ I. The testimony of Mary Wlach to the declarations of the parents of the testator that the father was married but once and that his wife, Frantiska, was the mother of the testator, and the testimony of Anna Kvidera as to like declarations of her grandmother, who was the sister-in-law of Joseph Kladivo, Sr.—the wife of his brother—were within the well-settled ex-

1404

ception to the hearsay rule that matters of pedigree, including birth, marriage, death, descent, paternity, etc. may be proved by family reputation, tradition, or declarations. The declarants all come within the conditions essential to the admission of this type of testimony. They were dead. They were members of the Kladivo and Vasko families and knew the facts. The declarations were made long before the matters involved in the litigation were in controversy. There was no motive or interest in the declarants to speak other than the truth. This rule has been many times announced by this court. See Alston v. Alston, 114 Iowa 29, 34–38, 86 N. W. 55; In re Estate of Carroll, 149 Iowa 617, 620, 621, 128 N. W. 929; In re Estate of Frey, 207 Iowa 1229–1238, 224 N. W. 597; Smith v. Fuller, 138 Iowa 91, 95, 96, 115 N. W. 912, 16 L. R. A., N. S., 98; In re Estate of Felle, 237 Iowa 1082, 1086, 23 N. W. 2d 910; In re Estate of Clark, 228 Iowa 75, 97, 98, 104, 290 N. W. 13; In re Estate of Corbin, 235 Iowa 654, 657–659, 17 N. W. 2d 417; Hopp v. Petkin, 222 Iowa 609, 612, 269 N. W. 758. It is a general rule. 1 Elliott on Evidence, chapter XVI; 3 Wigmore on Evidence, Second Ed., section 1480 et seq.; 20 Am. Jur., Evidence, section 468 et seq.; 31 C. J. S., Evidence, section 226 et seq.; 1 Greenleaf on Evidence, sections 103–107.

II. Appellants objected to the admission of Exhibit 4, the passport issued by the Austro-Hungarian Government to Joseph Kladivo, Sr. and his family, as secondary, hearsay and not authenticated. This exhibit is of different character than are Exhibits 3, 7 and 8, which are but copies. On their face they indicate that a better grade of evidence exists—the original records. But that is not true of Exhibit 4. It is the original document. There is nothing in the record to indicate that any other evidence of it exists in the issuing government. If there be such evidence it is secondary, as the original document is the best evidence. If it be said that its genuineness should be authenticated to show that those executing it had authority to do so—and we are not saying that it should—it may be answered that it was accepted as, and conceded to be, authentic and genuine by the Federal Government when it admitted the Kladivo family into this country.

Furthermore, it clearly comes within the class of "ancient documents" which are excepted from the general rule that the execution of documents of various kinds should be established by the testimony of the makers, subscribing witnesses, or otherwise, before admission in evidence. It is now uniformly recognized that to qualify as an ancient document it must be thirty years or more old. It is also a requisite, or at least an important factor for consideration, that the document comes from proper custody, that is from the custody of one who naturally and reasonably would be in possession of it. Also it should have the appearance of age and genuineness, and be free from suspicious circumstances casting discredit on either. If there are accompanying acts on the part of the possessor, such as rights exercised under it, or care in preserving it, these are ordinarily reasonable assurance of its genuineness. When the factors herein noted are present the document is admitted without further authentication. The reason that the document is thus allowed to prove itself is that definite proof of its execution would usually be difficult and oftentimes impossible. See 1 Elliott on Evidence, chapter XIX; 32 C. J. S., Evidence, section 743 et seq.; 20 Am. Jur., Evidence, section 932 et seq.; 2 Wigmore on Evidence, Second Ed., section 1311; 4 Wigmore on Evidence, Second Ed., section 2137 et seq.; Bidwell v. McCuen, 183 Iowa 633, 639-642, 166 N. W. 369; Bergman v. Carson, 226 Iowa 449, 452, 284 N. W. 442; Plattsmouth Bridge Co. v. Globe Oil & Refining Co., 232 Iowa 1118, 1124, 7 N. W. 2d 409; 1 Greenleaf on Evidence, sections 20-23.

Exhibit 4 was issued to Joseph Kladivo, Sr. in 1881. He preserved it until he died in 1904, and it was found in a trunk of the testator after his death in 1943. It was approximately sixty-six years old when it was admitted in evidence. It was at all times in the possession and custody of those entitled to it. There was nothing to impeach its authenticity. If Joseph Kladivo, Sr. had been living at the time of the trial, Exhibit 4 would have been admissible on his testimony that he received it from the issuing government, without further authentication. His wife and son could also have so testified if they had personal knowledge of the fact. Mary Wlach, or Mary Sokol, as her name

appears in the exhibit, was too young to have any knowledge of it. The exhibit was rightly received.

It very definitely corroborates and confirms the testimony of Mary Wlach. It shows the birth of the testator in 1863. He was past seventeen years old when the passport was issued. His hair, eyes, and features are shown by it to be similar to both Mr. and Mrs. Kladivo.

III. Appellants contend that Exhibits 3, 7, and 8 should not have been received in evidence, because, being just copies of records in a parish or church register of a foreign country, they were not properly certified and authenticated, and no authority was shown for the making or keeping of such records. We know from the study of general history, past and present, and from the tracing of lineage and our knowledge of genealogy, and from the decisions of many courts that it has been the practice of all civilized countries for many centuries to make and keep, in churches and departments of government, records of birth, baptism, marriage, death, and burial, of those affiliated with churches, and people generally. It is a necessity in matters of ownership, transfer, descent, and title of property, and of inestimable advantage and value to the public in many other matters. In Iowa and in perhaps all of the states the keeping of these vital statistics is required by statute, and the certificate of the registrar or custodian of these records is by statute receivable in evidence of their contents in all courts. The United States was settled by emigrants from foreign countries and its inhabitants in enormous numbers trace their ancestry to these countries all over the world, and a very great many were born in or lived there to maturity. Many others have traveled widely in foreign lands. For all of these reasons it might well be said that the courts should take judicial notice of the fact that these records are kept. On the continent of Europe the system is known as the "register of civil status." In this country it is becoming more and more essential, because of social security, and like legislation, both state and national, and because of pension systems, both public and private, and the cosmopolitan character of our population, that any regulations and restrictions in the admission in evidence of matters contained in these records should be as liberal and relaxed as may be consistent

with accuracy and safety. These entries are as little likely to be false and inaccurate as the regular entries in books of account of business or the professions. See 3 Wigmore on Evidence, section 1642 and chapter LIV, generally.

In Iowa there is no statute providing for the authentication of church records or registers of foreign countries of birth, baptism, marriage, death, or burial, or of copies of such records, so that they may be admitted in evidence in the courts of the state. Litigants are forced to use the cumbersome and narrow common-law method, or to have a person who has examined and made a copy of a record testify to it as a witness, or to prove the record by deposition taken in the foreign country. Sections 622.55, 622.58, 622.59, 622.60 and 622.61, of the 1946 Code apply, respectively, to court records, legislation, statutes, unwritten law, and other matters. On page lxii of the 1946 Code is a copy of the Federal statutes applying to court records, legislative acts, and other records and books of any state, territory, or country subject to the jurisdiction of the United States.

At common law there was no implied authority in the custodian of public or quasi-public records to give certified copies thereof. But in United States v. Percheman, 7 Pet. (U. S.) 51, 85, 86, 8 L. Ed. 604, 617, the United States Supreme Court, speaking through Chief Justice MARSHALL, held that such custodian has, by implication of his office, and without express order, an authority to certify copies. This principle has become the orthodox common law of the United States. It is still used where no statute has been enacted. 3 Wigmore on Evidence, Second Ed., section 1677, page 553. But it is still necessary for the one offering the instrument, to establish that it is an authorized certified copy, by authenticating it.

Most states have provided by statutes what must be done to authenticate foreign nonjudicial records. In Barber v. International Co. of Mexico, 73 Conn. 587, 602, 48 A. 758, 764, the court said:

"The statutes of this State make no provision as to the mode of authenticating official copies of documents found in foreign registries or public offices. * * * Whether there has been a proper authentication of foreign ones must therefore be de-

termined by the courts, as occasion may require, in such cases as arise, under the guidance furnished by the rules of the common law or the usages of nations.

"The object of any such authentication is to afford satisfactory evidence that the document offered is in fact certified by the official custodian of the original of which it purports to be a copy, having due authority to make such certification. Any evidence is sufficient for this purpose which is calculated to give reasonable assurance of the facts in question. Of this nature is whatever legitimately tends to prove that the document was obtained from the office where the original is kept; that the signature of the certificate was made by the individual whose name is thus subscribed; that he held, at the time, the official position indicated by his subscription; and that it is one of the functions of those holding that position to certify to such copies. * * *

"It is difficult and expensive to produce oral testimony to these points, and hardly less so to resort to written depositions. By the usages of civilized nations; therefore, proof is allowed of all or some of them in the shape of certificates from public officers under their official seals, when these seals are such that the court takes judicial notice of them.

"The seal of a notary public is one of this description, whenever it is used to attest a document which by the usages of nations may be so attested."

In that case the registrar signed his certificate before a notary public who under his signature and seal fully attested to the authority of the registrar, and his execution of the certificate. A further certificate was appended of the consul general of the United States at London that the notary was authorized to practice in London and that full faith and credit should be given to the certification so made, "in judicature and without." The consul of Mexico under seal made a similar certificate. The exhibit was received in evidence. See also 3 Wigmore on Evidence, Second Ed., section 1679; Boyce v. McKenna, 211 Mich. 204, 178 N. W. 701–705; State v. Miller, 71 Kan. 200, 80 P. 51, 52, 6 Ann. Cas. 58; Succession of Justus, 48 La. Ann. 1096, 1098, 20 So. 680, 681; In re Derinza, 229 Mass. 435,

118 N. E. 942; Hunt v. Supreme Council of Order of Chosen Friends, 64 Mich. 671, 673, 31 N. W. 576, 577, 8 Am. St. Rep. 855; Tessmann v. Supreme Commandery of the United Friends of Michigan, 103 Mich. 185, 61 N. W. 261, 262; Russo v. Metropolitan Life Ins. Co., 125 Conn. 132, 3 A. 2d 844, 845, 846; Schaffer v. Krestovnikow, 88 N. J. Eq. 523, 103 A. 913–915; Royal Neighbors of America v. Hayes, 150 Ky. 626, 150 S. W. 845; 32 C. J. S., Evidence, sections 634 et seq., 675; 20 Am. Jur., Evidence, sections 922, 952, 984 et seq.

Louis Straka testified that under the Austrian-Hungary Government all churches received government support and one of their duties was to keep record of births, marriages, and deaths, and that all such records are open to inspection by any interested party. We think, under the record, that parish records were of a public nature and authorized by custom and governmental authority to be kept by the churches. Straka was apparently qualified to testify as he did.

The certification of copies of the record appears to be lacking. The purported copies have only the statements of the signer, who subscribes himself in each case as an officer of the church, that the record shows the matters stated. There is no statement that these copies are true. There is no authentication whatsoever by any superior church officer, or government officer, notary, or consul or officer of the United States, that those who signed the exhibits were in fact custodians of the records, or that they in fact affixed their names and the seal of the church or parish to the certificates.

At common law the authentication was by the great seal of the Government, of which seal all countries take judicial notice, or under some other official seal so noticed.

IV. It is suggested by appellees that Exhibits 3 and 7 were admissible as ancient documents since the records were made over eighty years ago, and the certificates were made over thirty years before the trial. It is true that the term "ancient documents" is quite inclusive and covers many instruments, such as deeds, leases, wills, powers of attorney, letters, receipts, abstracts of title, maps, plats, marriage certificates, contracts, patents, books. Others could be mentioned. They are received and prove themselves because proof of their execu-

tion is presumed to be unavailable or gone because of their age.

■ Church records are not in fact documents. They are official statements or records made by the celebrant of the ceremony at a baptism, marriage or burial. It is a permanent, public record always open and available to anyone interested in it. Proof is never lacking of the record regardless of its age, or whether the participants be alive or dead. It can always be proven in court by the record itself, or by one who has examined or copied it, or by a certified copy properly authenticated. The essentials of proper authentication apply to ancient foreign records as well as to recent ones. There is no necessity of the application of the "ancient-document" rule to prove or make admissible in evidence these records. They can be proved by a certified copy authenticated as required by the common law or by statute. Neither method makes any exemption for instruments coming within the ancient-document rule. We have found only one case in which a certified copy of a foreign church record was held admissible because the record was over thirty years old. It is Bergman v. Carson, 226 Iowa 449, 451–453, 284 N. W. 442, 449. The certified records in that case were in the same condition with respect to certification and authentication as the exhibits in this case. The copies were simply signed by the church rector in the fall of 1937. The copies were not thirty years old, but the records were made in 1874 and were over that age. There was no authentication.

It was not necessary to say anything in the opinion about "ancient documents" or the rule pertaining to them. That rule is called into action only to permit the document to be received in evidence. There was no question of admissibility of the exhibits in that case. The parties stipulated that further certification and authentication was waived and the exhibits were admitted in evidence for the benefit of both parties. There was no authentication by the consulate of Sweden. The copies were in the Swedish language and the parties agreed that the consul for Sweden in Chicago would translate them into English.

The decision is not authority for the admission of Exhibits 3 and 7 as ancient documents. Exhibits 7 and 8 were certified copies of the same record. The first was copied from the record

in 1913, the second, in 1947. The certification of each was the same. Neither was authenticated. We see no superiority, preference, probative value, or right to admissibility of one over the other. It is our conclusion that Exhibits 3, 7 and 8 were not admissible because of lack of proper certification and authentication, and that none of them was admissible as ancient documents. These exhibits if they were admissible would establish conclusively that Frantiska Vasko, and not Anna Blazek, was the mother of the testator. We have not considered them in determining this appeal. However it is our firm conclusion that the record without them amply sustains the decree of the district court and that it should be, and is, affirmed.—Affirmed.

OLIVER, HALE, GARFIELD, WENNERSTRUM, MANTZ, MULRONEY, and HAYS, JJ., concur.

SMITH, C. J., concurs in result.